Douglas **PARKER**, Plaintiff,

v.

**SONY PICTURES ENTERTAINMENT, INC., Columbia Pictures Industries, and Sony Corporation of America, Inc.,** Defendants.

No. 97 Civ. 264(LAK).

United States District Court,
S.D. New York.

Sept. 4, 1998.

Stanley N. Futterman, New York City, for Plaintiff.

Lauren Reiter Brody, Dana S. Gershon, Rosenman & Colin LLP, New York City, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Douglas Parker brings suit against his former employer under the Americans With Disabilities Act [1] ("ADA"), the New York Human Rights Law [2] ("NYHRL"), and the Family and Medical Leave Act [3] ("FMLA"). Parker alleges that he was discriminated against in violation of these statutes because his employer, Sony Pictures Entertainment, Inc. ("SPE"), and two of its affiliates fired him after he had been absent from his job for six months following a back injury that occurred at SPE's facility. Parker contends also that the

---

[1]. 42 U.S.C. §§ 12101–12213.

[2]. N.Y. Exec. Law § 297 (McKinney 1993 & Supp. 1997).

[3]. 29 U.S.C. § 2612(a)(1)(D).

defendants later retaliated against him when they refused to rehire him for his former position. The defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Parker cross-moves to amend his complaint to state a contract claim against the defendants.

## Background
### Parker Employed by SPE

Parker began work at SPE's Film and Tape Operations facility ("FTO") located in Inwood, New York, in April 1993. The FTO division prepares and services film elements and videotape for use in creating finished movie and television products requested by SPE customers.[4] Parker served as an at-will employee in the position of Executive Director, Technical Services of the FTO division.[5] His job required him to supervise a process by which master tapes of television programs or movies were built to customer specification.[6] Parker managed a staff of up to thirty-one individuals and was responsible for training, supervising and meeting with them on a regular basis.[7] His job was a demanding one and involved frequent meetings and almost constant interaction with both his staff and his own supervisors.[8] Parker's position required also "constant running around" to check on his staff's progress and to meet with others at the facility such as researchers and expediters.[9] And Parker reviewed much of his staff's work product on monitors located at the video facilities at Inwood.[10]

### Parker Injured at Work

On Thursday, March 16, 1995, Parker was involved in an accident at the Inwood facility. While he and others were searching through boxes in the warehouse section of the facility, some cartons fell on top of Parker, causing an injury to his back.[11] Parker came to work the next day, but on the following Monday, March 20, he worked only for a couple of the hours in the morning before leaving to seek medical attention.[12] Parker never returned to the Inwood facility to work.

Parker's doctors initially recommended a treatment of muscle relaxants, anti-inflammatories, epidurals and rest.[13] As his condition failed to improve, however, it became apparent that Parker required surgery.[14] In mid-May 1995, Parker notified SPE that he had a serious health condition which required him to remain out of work and that he needed to have "major surgery" on his pelvic area.[15]

After receiving verbal notice from Parker in mid-May that he would not be able to return to work for some time, SPE's human resources department sent Parker a note dated May 19, 1995 and a letter dated May 22, 1995 notifying him of his rights and obligations under FMLA and under SPE's short-term disability policy.[16] The FMLA notification specified that his "requested leave would be counted against your [FMLA] and New

4. Def. Ex. 2, at 64–65, 94–95.

5. Def. Rule 56.1 Stmt. ¶ 14; Def. Ex. 5.

6. Def. Ex. 2, at 83–84, 88, 94–95, 100.

7. *Id.* at 83–84, 102.

8. *Id.* at 104 (Parker stated that he "had a lot of personnel issues that I had to deal with daily, as far as attendance, other things that came up with the individuals, as well as constant meetings all day long with customer sales/service and management on issues that were affecting the department ... That was several meetings a day. So I was totally responsible for that area and those individuals. Yet I had managers and directors reporting to me.").

9. *Id.* at 109–10 ("It was constantly moving all day long.... I had [ ] people downstairs, I had [ ] people upstairs, I had expediters on the other side of the building, I had research people near me, I had conversations with the executives involved in the manufacturing, who were on the other side of the building.").

10. *Id.* at 103.

11. *Id.* at 164, 166; *id.* Ex. 15.

12. Def. Rule 56.1 Stmt. ¶ 38.

13. Def. Rule 56.1 Stmt. ¶ 41.

14. Def. Rule 56.1 Stmt. ¶ 42; Def. Ex. 2 at 260; *id.* at Ex. 6.

15. Def. Rule 56.1 Stmt. ¶ 43; Def. Ex. 2 at 259–60.

16. Def. Rule 56.1 Stmt. ¶ 44; Def. Exs. 11, 12, 13.

York State Family Rights Act ('FRA') entitlement" and that, as "set forth in the Company policy, you will be required to substitute paid leave for unpaid FMLA leave." [17] Parker was provided also with a FMLA medical certification form for his physician to submit to SPE.[18]

The letter relating to SPE's short-term disability policy contained a description of the company's short-term disability benefits and reiterated to Parker that, based on the duration of his employment, he was entitled to six-months of leave, whether paid or unpaid.[19] According to the letter, SPE's policy requires an employee who is absent from work to provide a note from his or her physician certifying the illness every thirty days during the employee's absence and another note releasing the employee to return to work prior to or at the time of the employee's return.[20]

On May 31, 1995, Dr. Jafar J. Jafar performed surgery on Parker's back after which Parker was hospitalized for three days.[21] On June 21, 1995, Dr. Jafar sent a fax to SPE informing the company that he had performed the surgery and that it was "undetermined" when Parker would return to work.[22] Parker's treating physician, Dr. Nancy L. Mueller, also certified in June that Parker then was "unable to perform work of any kind" due to his "serious health condition," that the duration of Parker's condition was "undetermined," that he had undergone surgery and would receive other treatment, and that it would be necessary for Parker to work on a reduced or intermittent schedule for some period, depending on his response to treatment.[23] On July 27, 1995, Dr. Muel-

ler updated SPE by fax that Parker suffered from "lumbosacral polyradiculopathy" and that the prescribed treatment plan was medication and "no work." [24] On August 23, 1995, Dr. Mueller again sent a note with the same diagnosis and treatment plan—"no work." [25] And yet again on August 24, 1995, Dr. Mueller found that Parker was "unchanged since last visit" and that the treatment plan included physical therapy six times per week.[26] Finally, on September 8, 1995, Dr. Mueller sent SPE a note that her findings were "unchanged since last visit." [27]

At no time did any of Parker's doctors notify SPE that Parker was able to return to work.[28]

### Parker Terminated from SPE

On or about September 11, 1995, Parker received a call from Mary Cipolla of SPE's human resources department advising him that, as would be indicated in a forthcoming letter, his employment with SPE would be terminated as of September 15, 1995.[29] The letter stated that Parker's disability coverage began on March 17, 1995, that he had "exhausted the maximum period of paid disability benefits as well as FMLA benefits," and that his employment with SPE would terminate effective September 15, 1995.[30]

On September 13, 1995, Parker applied for long-term disability benefits.[31] In his application, Parker stated that he was unable to work because he was "completely incapacitated" and "disabled" and that it was unknown when he expected to return to work.[32] Two of Parker's physicians submitted statements in support of his application. Dr. Mueller

**17.** Def. Exs. 12, 13.

**18.** Def. Ex. 13.

**19.** Def. Ex. 13 at 74–77.

**20.** Def. Ex. 13 at 74, 76.

**21.** Def. Ex. 2 at 260, 281.

**22.** Def. Ex. 18.

**23.** Def. Ex. 17.

**24.** Def. Ex. 19.

**25.** Def. Ex. 20.

**26.** Def. Ex. 21.

**27.** Def. Ex. 22.

**28.** Def. Ex. 2 at 391–92.

**29.** Parker Aff. ¶ 3(E); Def. Rule 56.1 Stmt. ¶ 75; Def. Ex. 30.

**30.** Def. Ex. 16.

**31.** Def. Ex. 23.

**32.** *Id.*

certified that Parker suffered from "lumbosacral polyradiculopathy" and "radiculitis," that he was "unable to sit, stand, walk for an (sic) long periods of time," and that it was "undetermined" when any fundamental changes in Parker's medical condition would occur.[33] Parker's chiropractor, Dr. Joseph DeFazio, confirmed that Parker should not engage in "extended periods of sitting, no lifting, no pulling or pushing of objects," and that Parker could not "lift, push or pull any object with any weight, bend at the waist more than 20 degrees, turn or rotate the torso in any direction over 10 degrees, limited activities of daily living."[34] Dr. DeFazio's prognosis was "extremely guarded," and he also was "unable to assess" when any fundamental changes in Parker's medical condition could be expected.[35] As a consequence of Parker's application, he received long-term disability benefits from September 1995 through January 1996.[36]

In October 1995, Parker applied for social security disability benefits. Parker stated in his application that he "became unable to work because of my disabling condition on March 16, 1995" and that he was "still disabled."[37] He stated that his disability prevented him from working because he had "problems sitting, standing and walking for sustained periods" and he had "constant pain in right leg from groin to heel."[38] He averred that he was "not able to lift much weight" and has "limitations in my mobility."[39]

Parker went on to describe his job at SPE as involving walking, standing, sitting, bending and reaching several hours a day.[40] Parker affirmed also that his position required him to lift and carry "video tapes, 35 mm film prints, magnetic trks., negative film elements . . . from vault to screening room or work station" and that these items weighed up to 50 pounds on occasion and "frequently" up to 25 pounds.[41] Parker affirmed under penalty of perjury that all of the information contained in the application was true.[42]

Although Parker swore to the Social Security Administration ("SSA") in October 1995 that he was totally disabled, he asserts that he sought to be reinstated to his job during October and November 1995.[43] He claims that he phoned his former boss, Bill Theis, and Theis' successor, Brunella Lisi, to tell them that he "was fully ready to come back to work" but that his efforts were spurned.[44]

*Parker Files EEOC Complaint*

In March 1996, Parker filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was terminated from his job because of disability.[45] The EEOC determined after an investigation that Parker was not a "qualified individual with a disability" in that he was "unable to perform the essential functions of his position, with or without a reasonable accommodation, and in fact applied for long term disability benefits prior to the date he was terminated."[46] In consequence, the EEOC determined that "it [was] not likely that further investigation will result in a finding of a violation against [Parker]" and thus dismissed the complaint and issued a "Notice of Right to Sue."[47]

*Parker Applies to SPE for Position of Director of Technical Services*

At some point, SPE reorganized its FTO division. Several months before Parker's injury, he began reporting to Lisi on some

33. Def. Ex. 24.

34. Def. Ex. 26.

35. *Id.*

36. Def. Exs. 2 at 388, 27, 28.

37. Def. Ex. 32 at 283.

38. Def. Ex. 32 at 274.

39. Def. Ex. 32, at 277.

40. Def. Ex. 32 at 279.

41. *Id.*

42. *Id.* at 285.

43. Parker Aff. ¶ 3(Q).

44. *Id.*

45. Def. Ex. 25.

46. Def. Ex. 45.

47. *Id.*

matters rather than to his former boss, Bill Theis.[48] By memo dated September 14, 1995, Lisi proposed a further reorganization of the Technical Services and Asset Management area, indicating that the job of Executive Director of Technical Services—Parker's former job title—was "to be determined." [49]

Ultimately, however, a lower-level employee, the Director of Technical Services, departed the company, and SPE sought to fill that position, which carried a smaller salary than the executive director position formerly held by Parker.[50] SPE placed an advertisement in a trade publication, *Broadcasting & Cable,* for the director position,[51] and Parker submitted his resume on June 4, 1996.[52] In addition to the resume, Parker included a letter in which he stated that the position advertised was "the same position—or close to it" that he had held until September 1995 and that he had "now recovered well enough to return to work full-time." [53]

SPE did not rehire Parker. By letter dated August 1, 1996, SPE informed Parker that "since the time [he] responded to the advertisement, the company has, based on business considerations, re-evaluated its need for that position" and that it had "determined not to fill the [director] position at this time or in the near future." [54] SPE contends that Parker's former position at FTO never was filled,[55] but Parker maintains that ultimately the director of Technical Services slot went to one of his own former subordinates.[56]

*Parker Files Second EEOC Complaint*

In January 1997, Parker filed a second complaint with the EEOC, this time arguing that SPE retaliated or discriminated against him by failing to hire him as Director of Technical Services.[57] The EEOC notified Parker in March 1997 that it had found no evidence that SPE's "actions were motivated by . . . retaliation," [58] and once again the EEOC dismissed his complaint and issued a "Notice of Right to Sue." [59]

*Parker Institutes Suit*

In January 1997, Parker filed suit against SPE, Sony Corporation of America, Inc. ("SCOA"), and Columbia Pictures Industries ("CPI"). Parker asserts in his first cause of action that the defendants violated the ADA through their failure to accommodate his disability, termination of his employment and failure to reinstate him to his previous position. The second claim makes the same allegations under the NYHRL.[60] Parker's third claim argues that the defendants discriminated against him either because of his disability or in retaliation for his EEOC complaint by failing to rehire him for the position advertised in the trade publication and that this violated the ADA. The fourth claim mirrors the third except that it is based on the NYHRL. Finally, Parker asserts in his fifth claim that the defendants' actions in firing him violated the FMLA.[61] The defendants move for summary judgment.

*Discussion*

I. *Defendants' Summary Judgment Motion*

A. *Discriminatory Discharge Claims*

1. *ADA*

■ The ADA prohibits employers from discriminating "against a qualified individual

48. Parker Aff. ¶ 3(L); Lisi Dep. at 12–13.

49. *See* Def. Ex. 33.

50. Def. Ex. 35.

51. Def. Ex. 36.

52. Def. Exs. 3, 37.

53. Def. Ex. 37.

54. Def. Ex. 43.

55. Rule 56.1 Stmt. ¶ 90.

56. Parker Aff. ¶ 3(T).

57. Def. Ex. 46.

58. Def. Ex. 47.

59. *Id.*

60. N.Y. Exec. L. § 296(1)(a).

61. 29 U.S.C. § 2612(a)(1)(D). Parker's complaint included also his claim that the defendants intentionally inflicted emotional distress through their actions. That claim was dismissed, however, pursuant to this Court's Order of June 3, 1997, as "barred by the statute of limitations and in any case [for]fail[ure] to state a claim upon which relief may be granted."

with a disability because of the disability." [62] An ADA plaintiff alleging employment discrimination bears the initial burden of establishing a *prima facie* case.[63] In order to establish a *prima facie* case of discriminatory discharge, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability.[64]

Parker claims that his back injury constituted a disability within the meaning of the statute, that despite this disability he could perform the essential functions of his job from his home, and that he did in fact work from his home for some time following his accident. Parker argues that permitting him to work from his home was a reasonable accommodation and that it therefore was impermissible for SPE to fire him. However, contrary to the allegations of the complaint, Parker now has conceded that he was fired not because his back injury rendered it impossible for him to return to work but instead because Brunella Lisi, who became his superior in January 1995, decided to get rid of Parker in furtherance of her "plan to build an organization at Inwood that she would feel was loyal to and dependent only on her" and to "discard[ ]" Parker's mentor, Theis, and "Theis' people." [65] As Parker put it in his affidavit: "Through the means of this proceeding I have learned the true reason that I was fired. It is not because [the defendants] thought that I was unable to return to work at the end of a six month leave ... nor because I filed for long term disability.... The reason I was fired, I have learned through this action, was that my disability provided a convenient means for Brunella Lisi to remove me at minimum cost to herself and [the defendants]." [66]

### "Because of" the Disability

■ Parker's final argument—that he was fired by Lisi not because of his back injury but out of her desire to get rid of Theis and "Theis' people," who included Parker—renders his discriminatory discharge claim meritless. One of the requirements of a *prima facie* case of discriminatory discharge is that the plaintiff was fired because of the disability. Here, Parker contends that the disability was a mere pretext for firing him for another reason entirely: a political reorganization of the firm instigated by Lisi. Parker points to Lisi's deposition testimony, in which she stated that she had been asked by human resources in early September 1995 whether or not to extend Parker's leave of absence and that she told human resources to proceed with his termination.[67] Then Parker refers to a memorandum sent by Lisi to the vice president and general manager of FTO on September 14, 1995—several days after Parker had been told he was being fired effective September 15—in which Lisi proposed a reorganization of the Technical Services area that did not include Parker. Thus, by Parker's own theory of the case, Lisi was responsible for having him fired because she wanted to reorganize her area of the company or because of some political in-fighting. Consequently, Parker has not even alleged that he was fired "because of" his disability and thus he cannot recover under the ADA for his discharge.

### "Otherwise Qualified"

■ Only a "qualified individual with a disability" may state a claim for discrimination under the ADA. Even had Parker alleged that he was fired because of his disability, he has not demonstrated that he is a "qualified individual with a disability."

The ADA defines "qualified individual with a disability" as an "individual with a disabili-

---

**62.** 42 U.S.C. § 12112(a).

**63.** *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869 (2d Cir.1998).

**64.** *Id.* at 869–70; *see also Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1035 (2d Cir.), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993); *Heilweil v. Mount Sinai Hosp.*, 32

F.3d 718, 722 (2d Cir.1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

**65.** Pl. Mem. at 13.

**66.** Parker Aff. ¶ 3(J)–(K).

**67.** Parker Aff. ¶ 3(K); Lisi Dep. at 25–27; 30–37.

ty who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[68] If an individual is totally disabled and therefore unable to perform a job, no matter what its essential functions, then there can be no discriminatory discharge even where the individual is fired because of the disability.[69]

The defendants argue that Parker made numerous statements under penalty of perjury in his applications for Social Security disability benefits and for long term disability benefits to the effect that he was completely disabled and that he therefore cannot be heard now to claim that he was qualified to perform his job at SPE either with or without a reasonable accommodation. The Court thus must consider the effect of Parker's previous statements to both the Social Security Administration and SPE's long term disability insurance carrier on his current assertion that he was qualified to perform the essential functions of his job.

A number of circuit courts have considered the effect of a Social Security disability benefits application on a claimant's subsequent lawsuit under the ADA, primarily under an analysis of judicial estoppel. The overwhelming majority has concluded that a claim for Social Security benefits, standing alone, does not preclude a later ADA claim.[70] But many have found the Social Security

application "relevant evidence" in evaluating the ADA claim.[71] The Fifth Circuit, for example, concluded that "the application for or receipt of social security disability benefits creates a rebuttable presumption that the claimant or recipient of such benefits is judicially estopped from asserting that he is a 'qualified individual with a disability.'"[72] This Circuit expressly has left "for another day" whether a person should be precluded from bringing suit under the ADA based on previous statements in a Social Security benefits application.[73]

To take the broad view—that any application for social security benefits precludes a later ADA suit—seems unwarranted. The definition of disability for purposes of Social Security and the definition of "otherwise qualified" under the ADA are not coextensive.[74] Thus, "[i]t is at least theoretically conceivable that under some limited and highly unusual set of circumstances the two claims would not necessarily be mutually exclusive, as the SSA's determination of an applicant's entitlement to social security disability benefits would not be synonymous with a determination that a plaintiff is or is not a 'qualified individual with a disability' under the ADA."[75] However troublesome it might be that a claimant swears to be totally disabled for purposes of receiving disability benefits and then claims that he could per-

---

**68.** 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).

**69.** See, e.g., Kennedy v. Applause, 90 F.3d 1477, 1481–82 (9th Cir.1996).

**70.** See, e.g., Rascon v. U.S. West Communications, 143 F.3d 1324, 1330–32 (10th Cir.1998); Johnson v. State of Oregon, 141 F.3d 1361, 1366–67 (9th Cir.1998); Griffith v. Wal–Mart Stores, Inc., 135 F.3d 376, 381–83 (6th Cir.1998), petition for cert. filed, 66 U.S.L.W. 3800 (U.S. Jun. 9, 1998) (No. 97–1991); Talavera v. School Bd. of Palm Beach Co., 129 F.3d 1214, 1220 (11th Cir.1997), Weigel v. Target Stores, 122 F.3d 461, 466–68 (7th Cir.1997); Swanks v. Washington Metropolitan Area Transit Auth., 116 F.3d 582, 585–87 (D.C.Cir.1997); Cleveland v. Policy Mgmt. Sys. Corp., 120 F.3d 513, 517–18 (5th Cir.1997). But see McNemar v. The Disney Store, Inc., 91 F.3d 610, 617–18 (3d Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997).

**71.** Johnson, 141 F.3d at 1368–69, Weigel, 122 F.3d at 467–68, Swanks, 116 F.3d at 587.

**72.** Cleveland, 120 F.3d at 517–18.

**73.** Simon v. Safelite Glass Corp., 128 F.3d 68, 74 (2d Cir.1997); see also Disanto v. McGraw–Hill, Inc./Platt's Division, No. 97 Civ. 1090(JGK), 1998 WL 474136 (S.D.N.Y. Aug.11, 1998) (finding statements on a Social Security application "relevant evidence" in determining whether an ADA claim is warranted).

**74.** E.g., Johnson, 141 F.3d at 1366 ("It is possible, due to the different definitions of disability employed by various agencies, to qualify for disability benefits and to satisfy the ADA's definition of a qualified person with a disability.").

**75.** Cleveland, 120 F.3d at 517; accord, Swanks, 116 F.3d at 585 (where a "claimant had no accommodation in his or her past work, a Social Security Administration determination that the claimant cannot do past work says nothing about the claimant's ability to perform his or her former job with reasonable accommodation.").

form the essential functions of his or her position, this Court cannot conclude that the two statements necessarily are inconsistent in every circumstance. Thus, cases such as this one require a more exacting comparison of the statements sworn to before the SSA or in another context and those made in an ADA suit in order to determine whether the two are reconcilable.

In this case, Parker admits that he swore on his application for long-term disability benefits on September 13, 1995 which was two days prior to his termination, that he was "completely incapacitated—disabled" and that it was "unknown" when he could return to work.[76] Additionally, Parker swore to the SSA one month later that his condition kept him from working because it caused him "problems sitting, standing and walking for sustained periods,"[77] which the job at SPE required of him for a number of hours per day.[78] Moreover, Parker stated under oath that he was "not able to lift much weight,"[79] but he admitted that the SPE job required him to lift and carry 25 pound materials "frequently" and 50 pound materials on occasion.[80] Finally, Parker swore on the Social Security benefits form that he "became unable to work because of [his] disabling condition on March 16, 1995" and was "still disabled."[81] Parker now submits an affidavit, however, that he "would have" returned to his job had he known that reporting back to work by September 15th would have prevented him from being fired.[82]

Viewed in this light, the issue is not so much a question of estoppel as it is analogous to a party who has testified to one thing in a deposition but then submitted a contradictory affidavit for the purpose of creating an issue of fact and forestalling summary judgment. "It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."[83] The principle still stands where the party's affidavit purportedly contradicts a prior sworn statement rather than his deposition testimony. The issue therefore is whether Parker's affidavit on this motion should be disregarded because it contradicts his prior sworn statements to the SSA and the long-term disability insurance carrier.

Parker's statements that he was "completely incapacitated—disabled" and that he "became unable to work because of [his] disabling condition" are inconsistent with his contention in his affidavit the he "would have" returned to work had he known it would save his job. Especially viewed in light of Parker's description in the Social Security application of his job responsibilities, it is clear that Parker meant his statement that he was "still disabled" to mean that he then was unable to perform the essential functions of his job as he described them. Thus, Parker's affidavit creates no genuine issue of fact as to whether he was qualified to perform the essential functions of his job without a reasonable accommodation.

Nor does the other evidence on the record establish the existence of a genuine issue of fact with regard to Parker's ability to perform his job responsibilities without accommodation. Parker's doctors did not certify that he was capable of returning to work until January 21, 1996, five months after his termination.[84] At the time that he was fired,

---

**76.** Def. Ex. 23.

**77.** Def. Ex. 32 at 274.

**78.** Def. Ex. 279.

**79.** Def. Ex. 32 at 277.

**80.** Def. Ex. 32 at 279.

**81.** Def. Ex. 32 at 283.

**82.** Parker Aff. ¶ 3A.

**83.** *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) (quoting *Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20, 24 (2d Cir.), *cert. denied,*

474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985)); *see also Reisner v. General Motors Corp.,* 671 F.2d 91, 93 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982) (finding it proper to "disregard those factual claims made by [the plaintiff] after [the defendant] moved for summary judgment, where those claims contradict statements made previously by [the plaintiff] at his deposition, in his affidavits, and in response to defendants' interrogatories"); *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969).

**84.** Def. Rule 56.1 Stmt. ¶ 59; Def. Ex. 2, at 391– 92, 403–04. Parker claims that there remains a genuine issue of fact with respect to whether his

Parker's doctors had told SPE that his condition was "unchanged" from their earlier notifications in which they prescribed "no work."[85] Hence, there is nothing on the record to support Parker's contention that he was otherwise qualified to work without a reasonable accommodation. In view of this conclusion, the Court has no occasion to address the defendants' estoppel argument.[86]

Parker contends that even if the Court finds that he could not perform the essential functions of a job without any accommodation, he nevertheless was a qualified individual with a disability because he could have performed his job from his home, as he alleges he did in the first few months after his accident, and that it would have constituted a reasonable accommodation for SPE to have allowed him to do so. The ADA defines "reasonable accommodation" to include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations."[87] Parker has offered no support for the proposition that a reasonable accommodation includes working from one's home. Indeed, a number of courts to consider the issue have reached the contrary conclusion.[88]

Additionally, Parker's own deposition testimony and his statements to the SSA belie his assertion that he could perform the essential functions of his job from home. Parker testified at his deposition that his position required him to manage, train, supervise and regularly meet with his staff of thirty-one individuals,[89] to continuously interact with both his staff and his own supervisors,[90] to

physician "would forbid him from" returning to the Inwood facility to work and whether his physician "would sign a certificate stating that it was safe for him to do so," but he does not appear to dispute that his physician never did sign such a release. *See* Pl. Counter Rule 56.1 Stmt. ¶ 59; Def. Ex. 2, at 204 (Q "When did you receive that permission [from your doctors to return to work]"? A "I think it was the 21st of January.").

85. Def. Exs. 17, 18, 19, 20, 21, 22.

86. Although there ultimately may be merit to the defendants' estoppel argument, the record is less than conclusive on the point. To the extent that the defendants' estoppel argument rests on a theory of judicial estoppel, they have failed to show that Parker's application for Social Security benefits was successful. "In this Circuit, the doctrine of judicial estoppel requires not only that the party have taken an inconsistent position but also that the party succeeded in gaining some advantage by having done so." *Thomas v. Stone Container Corp.*, 922 F.Supp. 950, 954 (S.D.N.Y. 1996) (citations omitted); *see also Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir.1997) ("[judicial] estoppel only applies when a tribunal in a prior proceeding has accepted the claim at issue by rendering a favorable decision."). To the extent that the defendants' argument refers to a more general theory of equitable estoppel, they have not made a clear showing that they reasonably relied on Parker's misrepresentation of fact to their detriment. *See, e.g., Buttry v. General Signal Corp.*, 68 F.3d 1488 (2d Cir.1995) (stating as one element of equitable estoppel that the party invoking it reasonably relied on the misrepresentation to his or her detriment). Although it is conceivable that the defendants here might be able to demonstrate that their long-term disabili-

ty or worker's compensation premiums were affected by Parker's misrepresentations, they have not adduced such evidence. Their estoppel argument therefore is insufficient.

87. *See* 42 U.S.C. § 12111(9)(B); *Wernick v. Federal Reserve Bank of N.Y.*, 91 F.3d 379, 384 (2d Cir.1996).

88. *See, e.g., Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996) ("Because [plaintiff] could not attend work, he is not a 'qualified individual with a disability' under the ADA.... 'An essential element of any ... job is an ability to appear for work.'"); *Davis v. Pitney Bowes*, No. 95 Civ. 4765(LAP), 1997 WL 655935, at *16 (S.D.N.Y. Oct. 20, 1997) ("It is axiomatic that an employee who cannot show up for work cannot perform an 'essential function' of her job."), *aff'd*, 159 F.3d 1346, No. 97–9496, 1998 WL 477139 (2d Cir.1998); *Misek–Falkoff v. IBM Corp.*, 854 F.Supp. 215, 226 (S.D.N.Y.1994) ("'Some degree of regular, predictable attendance is fundamental to most jobs ...'"), *aff'd*, 60 F.3d 811 (2d Cir.), *cert. denied*, 517 U.S. 1111, 116 S.Ct. 1333, 134 L.Ed.2d 484 (1996).

89. *Id.* at 83–84, 102.

90. *Id.* at 104 (Parker stated that he "had a lot of personnel issues that I had to deal with daily, as far as attendance, other things that came up with the individuals, as well as constant meetings all day long with customer sales/service and management on issues that were affecting the department ... That was several meetings a day. So I was totally responsible for that area and those individuals. Yet I had managers and directors reporting to me.").

"constant[ly] run[ ] around" to check on his staff's progress and to meet with others at the facility such as researchers and expediters,[91] and to review much of his staff's work product on monitors located at the video facilities at Inwood.[92]  On his Social Security application, Parker testified that his job required him to stand, sit, walk, reach, and lift and carry, all of which he stated he could not then do.[93]  It is apparent that Parker himself considered presence at the Inwood site, and his mobility there, as essential functions of his job.

As Parker has not alleged that he was discharged "because of" his disability and has not shown that he was otherwise qualified to perform the essential functions of his job with or without reasonable accommodations, he has not established a *prima facie* case of discriminatory discharge and therefore is not entitled to relief on his ADA discriminatory discharge claim.[94]

### 2.  *NYHRL*

Parker sets forth an identical claim under New York's HRL.  The NYHRL forbids an employer to discharge an employee because of his or her disability.[95]  "Disability," although defined more broadly by the NYHRL,[96] nevertheless is "limited to disabil-

ities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held." [97]  In most respects, including those pertinent here, the HRL is analyzed coextensively with the ADA.[98] Consequently, Parker's NYHRL discriminatory discharge claim must fail for the same reasons as his ADA claim.  He did not allege that he was fired because of his disability and he has not shown that he could perform in a reasonable manner the activities involved in the job he held.[99]

### B.  *Retaliation Claims*

Parker claims also that the defendants retaliated against him for filing an EEOC complaint by refusing to rehire him in May 1996 for a position for which Parker applied and which Parker contends was his former job at SPE.[100] The defendants counter that, even if Parker could establish a *prima facie* retaliation case, he cannot effectively rebut SPE's legitimate, non-discriminatory reason for not hiring him—that SPE underwent a reorganization and decided not to fill the position with anyone.

---

91. *Id.* at 109–10 ("It was constantly moving all day long.... I had [ ] people downstairs.  I had [ ] people upstairs, I had expediters on the other side of the building, I had research people near me, I had conversations with the executives involved in the manufacturing, who were on the other side of the building.").

92. *Id.* at 103.

93. Def. Ex. 32.

94. Because Parker has not established a *prima facie* case of discriminatory discharge, the Court need not reach the defendants' contention that they had a legitimate, non-discriminatory reason for terminating Parker's employment.

95. N.Y. Exec. L. § 296(1)(a) (McKinney 1993).

96. *See Reeves v. Johnson Controls World Svcs.*, 140 F.3d 144, 155 (2d Cir.1998).

97. N.Y. Exec L. § 292(21) (Supp.1998).

98. *See Disanto*, 1998 WL 474136, at *6 n. 4; *see also Reeves*, 140 F.3d at 154.

99. *See AT&T Bell Labs. v. N.Y. State Div. of Human Rights*, 213 A.D.2d 230, 624 N.Y.S.2d 9, 10 (1st Dep't 1995) (an employee on disability leave "cannot contend that he [is] entitled to disability leave from his employer, which require[s] that he be actually unable to perform his duties at that job, and claim that, at the same time, his "disability" was within the protection of the [NYHRL], i.e., that it did not prevent him from reasonably performing his duties at the job sought."); *Miller v. Ravitch*, 130 A.D.2d 579, 515 N.Y.S.2d 518, 519 (2d Dep't) (employee who cannot perform duties reasonably "not considered disabled under the statute," and thus "not protected by its provisions"), *appeal denied*, 70 N.Y.2d 610, 522 N.Y.S.2d 110, 516 N.E.2d 1223 (1987); *Giaquinto v. New York Tel. Co.*, 135 A.D.2d 928, 522 N.Y.S.2d 329 (3d Dep't 1987) (finding an employee whose condition resulted in excessive absences due to hospitalization had not been discriminatorily discharged under NYHRL because the condition prevented her from performing job in a "reasonable manner"), *appeal denied*, 73 N.Y.2d 701, 535 N.Y.S.2d 595, 532 N.E.2d 101 (1988).

100. Cpt. ¶ 50.

■ Both the ADA and the NYHRL forbid employers to discriminate against an individual because the individual opposed a discriminatory practice or filed a complaint alleging discrimination by the employer.[101] In order to establish a *prima facie* retaliation case, the plaintiff must show that (1) he was engaged in a protected activity that was known to the defendants, (2) an adverse employment against was taken against him, and (3) there was a causal connection between the protected activity and the adverse action.[102]

■ It is undisputed that Parker filed a complaint with the EEOC in March 1996, alleging that he was terminated from his job because of disability,[103] which undoubtedly was a "protected activity" under both the ADA and the HRL. Nor do the defendants appear to contest that the failure to rehire Parker was an "adverse employment action" under the statutes.[104] Finally, although the defendants assert that nothing in the record establishes a causal connection between the protected activity and the adverse employment action, the "timing [of an adverse action may] support[ ][an] inference of discrimination sufficient to establish a *prima facie* case."[105] Parker filed an EEOC complaint in March and applied for the director job with SPE in June. SPE decided not to hire him in July. The timing supports Parker's contention that there was a causal connection between the adverse employment action and the protected activity to the minimal extent necessary to establish a *prima facie* case.[106]

■ With the *prima facie* case established, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for their refusal to hire Parker.[107] They contend that SPE undertook an extensive business reorganization about the time that Parker was fired in October 1996 which led them to conclude in July 1996, after Parker had applied for the director of Technical Services position, that they did not did not need to fill the position after all. By articulating a legitimate, non-discriminatory reason, the defendants have rebutted the presumption created by the plaintiff's *prima facie* showing. "The defendant's burden is light. The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." [108] If the employer has articulated such a reason, then "[t]he ultimate burden then rests on the plaintiff to persuade the factfinder that the employer's proffered explanation is merely a pretext for its inten-

---

**101.** 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this chapter."); N.Y. Exec. L. § 296(7) (McKinney 1993) ("It shall be unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article or because he has filed a complaint, testified or assisted in any proceeding under this article.").

**102.** *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995); *Querry v. Messar*, No. 98 CIV. 0019(WCC), 1998 WL 429820, *10 (S.D.N.Y. July 27, 1998) (ADA); *Hendler v. Intelecom USA, Inc.*, 963 F.Supp. 200, 211 (E.D.N.Y.1997) (ADA and HRL).

**103.** Def. Ex. 25.

**104.** Def. Mem. at 25 n. 9. Courts interpreting the analogous provision of Title VII have concluded that a refusal to rehire in the face of a complaint

of discrimination is an adverse employment action. *See Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 892–93 (7th Cir.1996); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1141 (5th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *Weissman v. Dawn Joy Fashions, Inc.*, No. 95 Civ. 1841(LLS), 1997 WL 458797, at *3 (S.D.N.Y. Aug. 11, 1997).

**105.** *Tomka*, 66 F.3d at 1308.

**106.** *Manoharan v. Columbia Univ. Col. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (causal connection established indirectly by showing that the protected activity was closely followed in time by the adverse action).

**107.** *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998) (applying *McDonnell Douglas* burden-shifting analysis to ADA claim); *Reeves*, 140 F.3d at 156 n. 9 (N.Y. Human Rights Law).

**108.** *Greenway*, 143 F.3d at 52.

tional discrimination."[109] The question then becomes whether or not the plaintiff has demonstrated the existence of a triable issue of fact on the ultimate issue of discrimination.

Parker argues that the business reorganization is a pretext and that SPE in fact refused to rehire him because he had filed an EEOC complaint against it. He points out that he was far more qualified for the job than his former subordinate who ultimately obtained the position, as Parker alleges was admitted by a senior SPE executive.[110] Parker contends that no one else applied for the job when Parker did (i.e., in May 1996, after the advertisement for the position ran in the trade journal) and that SPE decided not to fill the job only after Parker applied.[111] Finally, Parker relies on the inference created by the temporal proximity between his EEOC complaint and SPE's rejecting his job application. The defendants, on the other hand, do not offer any evidence of SPE's business reorganization or why or when company officials reached the decision to leave the Director of Technical Services slot empty. The Court concludes that there is a genuine issue of material fact on whether Parker was not rehired because he had filed an EEOC complaint against SPE.

## C. *FMLA Claim*

■ Under the FMLA, an employer must provide an employee with twelve weeks of unpaid leave when a serious health condition renders the employee unable to perform his job functions.[112] The employer may require the employee to take paid leave in lieu of unpaid leave.[113] Thus, if the employer so elects, the employee is not entitled to an additional period of unpaid leave after the twelve week period of paid leave has been exhausted. If at the end of the twelve week period, the employee "is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration" to his or her previous position or another position under the FMLA.[114]

Here, Parker claims that he did not receive the entire twelve weeks to which he was entitled by FMLA. Despite the fact that Parker left work on March 20, 1995, had not returned 25 weeks and 4 days later when he was terminated, and received his full salary during the entire period, Parker claims that he did not actually begin leave until the end of May when he was sent forms by SPE's human resources department informing him that he would have to take FMLA leave. Parker contends, moreover, that the period of time from March until July 1995, during which he says that he worked extensively at home, does not count towards his FMLA leave.[115] The defendants counter that the leave became effective on March 20, 1995, the first date that Parker was absent from the office due to his back injury, and that he

109. *Id.* (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

110. Theis Dep. at 300.

111. Def. Ex. 42.

112. *See* 29 U.S.C. § 2612(a)(1)(d).

113. 29 U.S.C. § 2612(d)(2)(A) ("An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid . vacation leave, personal leave, or family leave of the employee for leave provided under [FMLA] for any part of the 12–week period of such leave under [this Act].").

114. 29 C.F.R. § 825.214(b); *see also Beckendorf v. Schwegmann Giant Super Markers, Inc.,* 1997 WL 191504, 1997 U.S. Dist. LEXIS 5693

(E.D.La.1997) (finding employer is not required to reinstate employee who is not capable of returning to her position at the expiration of the 12 week period); *Soodman v. Wildman, Harrold, Allen & Dixon,* 1997 WL 106257, 1997 U.S. Dist. LEXIS 1495 (N.D.Ill.1997) (same); *Urbano v. Continental Airlines, Inc.,* 1996 WL 767426, 1996 U.S. Dist. LEXIS 20412 (S.D.Tex.1996).

115. Pl. Mem. at 7 ("It was Parker's understanding that his formal leave of absence would commence shortly before or when he entered the hospital at the end of May and would end when he started working again, either at Inwood or again at home until he was strong enough to return to Inwood. Parker assumed that his status with the Company during the time he worked at home—for many hours each weekday into the night, and on weekends as well—was the same as when he would work equivalent hours at the Inwood facility.").

received almost 26 weeks of paid leave which is 14 more weeks than FMLA required.

SPE first informed Parker that his leave would be counted as FMLA leave in the May 22, 1995 letter but did not at that time indicate that the FMLA leave was being applied retroactively to the date that Parker first missed work in March.[116] According to the governing regulations, however,

> "[i]f the employer has the requisite knowledge to make a determination that the paid leave is for an FMLA reason at the time the employee either gives notice of the need for leave or commences leave and fails to designate the leave as FMLA leave ..., the employer may not designate leave as FMLA leave retroactively, and may designate only prospectively as of the date of notification to the employee of the designation. In such circumstances, the employee is subject to the full protections of the Act, but none of the absence preceding the notice to the employee of the designation may be counted against the employee's 12-week FMLA leave entitlement." [117]

Here the record is ambiguous at best as to how much information SPE had in days immediately following the start of Parker's absence from work. It is clear that SPE knew that Parker suffered an injury at work on March 16, 1995, which precipitated his absences from work beginning March 20, 1995.[118] But whether SPE had enough information concerning the extent of the injury to determine whether Parker's health condition qualified him for FMLA leave is an issue of fact that cannot be resolved on this motion. Neither SPE nor Parker has set forth when SPE learned the extent Parker's injuries.

Consequently, the Court assumes, as it must for purposes of this motion, that the FMLA leave began on May 22, 1995 when SPE notified Parker that his leave would be counted as FMLA leave.

■ Obviously, there are more than twelve weeks between May 22, 1995 and September 15, 1995 for which Parker was paid. Parker's FMLA claim, then, depends on the effect of his having performed work while at home during the period of his "leave." The issue is one of first impression.

The FMLA states that in certain circumstances, an employee may take leave "intermittently or on a reduced leave schedule when medically necessary" and such leave "shall not result in a reduction in the total amount of leave to which the employee is entitled ... beyond the amount of leave actually taken." [119] In order to qualify, the employee must provide a "statement of the medical necessity for the intermittent leave or leave on a reduced leave schedule, and the expected duration of the intermittent leave or reduced leave schedule." [120]

Both the statute and regulations are silent with respect to whether such intermittent or reduced schedule leave may be mitigated by work performed away from the office. An opinion letter from the Department of Labor, however, does address the issue.[121] According to the letter, "[o]nly the amount of leave actually taken may be charged as FMLA leave," and "time that the employee is 'suffered and permitted' to work for the employer, whether requested or not by the employer, must be counted as 'hours worked' pursuant to the Fair Labor Standards Act

---

**116.** *See* Def. Ex. 13; Def. Ex. 16 (letter of termination dated September 12, 1995, indicating that Parker's "disability period began on March 17, 1995").

**117.** 29 C.F.R. § 825.208. Note that "[i]n all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, based on information provided by the employee." *Id.* § 825.208(a)(2). Where the employer lacks sufficient information about the employee's reason for taking leave, "the employer should inquire further to ascertain whether the paid leave is potentially FMLA-qualifying." *Id.*

**118.** *See, e.g.,* Def. Ex. 15 (letter dated March 21, 1995 from Parker to "Distribution" detailing warehouse incident).

**119.** 29 U.S.C. § 2612(b)(1); 29 C.F.R. § 825.205(a).

**120.** *See* 29 U.S.C. § 2613(b)(4)(B).

**121.** Administrative interpretations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

(FLSA)."[122] The letter makes clear that the time worked at home cannot be counted against the 12–week FMLA leave allowance.[123]

On June 30, 1995, Parker's treating physician, Dr. Nancy Mueller, certified on a SPE FMLA form that Parker then was "unable to perform work of any kind" and that it would be "necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of [his] condition," depending upon his response to treatment.[124] Other documentation provided by his physicians, however, prescribed a treatment involving "no work."[125] Consequently, there remains a genuine issue of fact as to whether Parker was on a reduced leave schedule or instead was on full leave.

Moreover, to the extent that Parker worked at home, whether at the request of his employer or not, the time he spent cannot be counted as part of the twelve week leave to which he was entitled. The record is ambiguous with respect to the amount of time that Parker spent working at home. He avers that he was "supervising the work of [his] office" within hours of returning from the doctor on March 20, 1995, and that he performed his job through "mid-July" when he realized that his "control" over his office was "weakening."[126] After mid-July, Parker claims that there came "an end to the regularity of the daily work packages," and "[w]ork and messages now came sporadically and by mid-August they were but a trickle."[127]

It very well may be that Parker was not working at home for more than twelve weeks between May 22 and September 15, 1995, in which case he would have no FMLA claim.

On this motion for summary judgment, however, the Court cannot resolve issues of fact. As there remain issues of fact concerning the hours that Parker spent working at home during his leave and whether his leave was a full leave or an intermittent or reduced leave schedule, summary judgment is inappropriate.

### D. Dismissal of Certain Defendants

■ Defendants SCOA and CPI have moved to dismiss the claims as against them. Parker concedes that SCOA now may be dismissed from the case,[128] but he contends that CPI constitutes an integrated enterprise with SPE, and therefore is a proper defendant.

■ The "burden of proving jurisdictional prerequisites lies on the party who seeks the exercise of jurisdiction in his favor."[129] The Second Circuit in *Cook v. Arrowsmith Shelburne, Inc.*,[130] held that whether a parent and subsidiary were a "single, integrated enterprise," and hence, the parent could be liable for the civil rights violations of its subsidiary, depends on a four-part test: whether the companies maintained (1) interrelated operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.[131] The "critical question," however, is " '[w]hat entity made the final decisions regarding employment matter related to the person claiming discrimination?' "[132] A plaintiff can satisfy the four-part test by " 'showing that there is an amount of participation [by the parent that] is sufficient and necessary to the total employment process [of the subsidiary], even absent total control

**122.** 6A Wages & Hours Manual (BNA) 99:3065 (July 21, 1995).

**123.** *Id.*

**124.** Def. Ex. 17.

**125.** *See, e.g.,* Def. Exs. 19, 20.

**126.** Parker Aff. ¶ B.

**127.** *Id.*

**128.** Pl. Mem. 3.

**129.** *Kheel v. Port of New York Authority,* 457 F.2d 46, 48 (2d Cir.), *cert. denied,* 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972) (citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)).

**130.** 69 F.3d 1235 (2d Cir.1995).

**131.** *Id.* at 1240.

**132.** *Id.* (quoting *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 (5th Cir.1983)).

or ultimate authority over hiring decisions.' "[133]

While the plaintiff has the burden of proof at trial, defendants must demonstrate that there is no genuine issue of material fact in order to prevail on this motion. In arguing that CPI and SPE were not a single employer, they rely only on the deposition testimony of Barbara Lopipero, the head of human resources for SPE on the east coast, who testified that in her estimation there was no coordination "between the different human resources departments such as at Sony Corporation of America, Sony Theaters, Sony Music, Sony Electronics and Sony Pictures Entertainment."[134] The testimony nowhere mentions CPI or its relation to SPE. Consequently, the defendants have failed to carry their burden of establishing the absence of a genuine issue of material fact as to whether SPE and CPI are an integrated enterprise, and thus summary judgment is inappropriate.

## II. *Motion to Amend Complaint*

■ Parker cross-moves to amend his complaint to add a contract claim against SPE. According to Parker, SPE was contractually obligated to provide him with six-months of paid sick leave, to be computed from the date he first was unable to work on account of his injury and excluding those periods of time while he was working at home, but SPE, in fact, provided something less than six months of paid sick leave.[135] Parker argues that, as a consequence of SPE terminating him prior to the end of six months, he was deprived of the opportunity to come back to work and continuing his career, and that "ending Parker's career as a SONY executive was a foreseeable consequence of SONY's violation of its contractual leave obligations; the damages arising from that are compensable as consequential damages. *Hadley v. Baxendale,* 9 Exch. 351 (1854)."[136]

■ Parker has not pointed to any contract on which his claim is based. There was no employment agreement between Parker and SPE, and Parker was an at-will employee.[137] That SPE may have had a written disability policy which set forth a company policy of six-months paid sick leave is of no moment. New York law squarely provides that employment manuals or personnel policies do not create employment contracts.[138]

■ A trial court may "deny[ ] leave to amend a complaint which even as amended would fail to state a cause of action."[139] This is such a proposed amendment. As Parker has provided no clear basis for his proposed contract claim, any leave to amend his complaint to add the claim would be futile.

Leave to amend the complaint is denied for an additional reason. According to the Scheduling Order dated September 9, 1997, any amendment of pleadings was to occur on or before October 1, 1997. No extension of this deadline was sought or granted. Plaintiff did not move to amend his complaint until March 30, 1998 and then only in response to the defendants' motion for summary judgment. As he has not demonstrated cause for his failure to comply with the Court's deadline, the Court denies the motion to amend the complaint on the alternative ground that it is untimely.

### Conclusion

Defendants' motion for summary judgment dismissing the complaint is granted to the

---

**133.** *Id.* at 1241 (quoting *Armbruster v. Quinn,* 711 F.2d 1332, 1338 (6th Cir.1983)).

**134.** Def. Ex. 29 at 17.

**135.** Pl. Proposed Am. Cpt.

**136.** Pl. Mem. 31.

**137.** *See* Def. Rule 56.1 Stmt. ¶ 14; Pl. Counter Rule 56.1 Stmt.

**138.** *See, e.g., De Petris v. Union Settlement Ass'n, Inc.,* 86 N.Y.2d 406, 412, 633 N.Y.S.2d 274, 277, 657 N.E.2d 269 (1995) (New York law is "well-settled . . . that the existence of a private employer's written policy does not, in and of itself, limit the right to discharge an at-will employee"); *Manning v. Norton Co.,* 189 A.D.2d 971, 972, 592 N.Y.S.2d 154, 155 (3d Dep't 1993); *Fiammetta v. St. Francis Hosp.,* 168 A.D.2d 556, 557, 562 N.Y.S.2d 777, 778 (2d Dep't 1990).

**139.** *S.S. Silberblatt Inc. v. East Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co.,* 608 F.2d 28, 42 (2d Cir.1979).

extent that plaintiff's (1) discriminatory discharge claim under the ADA and the NYHRL against all defendants, and (2) all claims against Sony Corporation of America are dismissed. It is denied with respect to plaintiff's retaliation and FMLA claims.

Plaintiff's cross-motion for leave to amend is denied.

SO ORDERED.