Gary MAZZA, Plaintiff,

v.

William BRATTON, as Commissioner of the New York City Police Department, Raymond P. Kelly, as Commissioner of the New York City Police Department, Lee P. Brown, as Commissioner of the New York City Police Department, The New York City Police Department and The Police Pension Fund Article II of the New York City Police Department, Defendants.

No. 94 CV 50695(NG)(CLP).

United States District Court,
E.D. New York.

Aug. 4, 2000.

Alan E. Wolin, Wolin & Wolin, Jericho, NY, for plaintiff.

Lisa Weiss, Elisa Baldwin, Corporation Counsel of the City of New York City, for defendant.

## OPINION AND ORDER

GERSHON, District Judge.

Gary Mazza was terminated as a probationary patrolman with the New York City Police Department ("NYPD") on February 25, 1993, after he had been out sick almost ten months with severe ulcerative colitis. He filed a claim of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"), which rejected his claim on the ground that, although Mazza was disabled, he was not a qualified person with a disability because, at the time of termination, he could not perform the essential functions of his job as a police officer, with or without accommodation. (Def.Ex.H).[1] This action followed, naming as defendants several former NYPD Commissioners, the NYPD and an NYPD Pension Fund (referred to herein collectively as "NYPD" or "defendant"). The complaint alleges disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* and the New York State Human Rights Law, N.Y.Exec.L. §§ 290 *et seq.* Plaintiff seeks reinstatement, back pay and benefits, and damages. Plaintiff also claims that he was wrongfully deprived of a pension and/or the opportunity to apply for a pension. Although the complaint is unclear as to whether the claims relating to the pension are based on federal as well as state law, plaintiff has explained in his memorandum and at oral argument of this motion that the claims are based on al-

---

1. "Def.Ex." and "Pl.Ex." refer to the exhibits submitted by defendants and plaintiff, respectively, in connection with the summary judgment motion. "Tr." designates the pages of the deposition transcript of the party identified.

leged violation of his rights under his contract and provisions of the New York State Constitution and state law, not the federal Constitution or statutes.

Defendant now moves for summary judgment on the ADA claim, on the grounds that plaintiff has not raised factual issues that he was disabled, qualified, wrongfully denied a reasonable accommodation, or improperly terminated. Defendant argues that plaintiff cannot establish: (1) that his condition substantially limited major life activities, as required to show a "disability" under the ADA; (2) that plaintiff could perform the essential functions of a police officer, with or without reasonable accommodation; and (3) that he ever requested a reasonable accommodation. Defendant also argues that plaintiff's claims relating to a pension should be rejected as a matter of law, contending that any rights plaintiff may have had as a probationary patrolman were automatically extinguished upon his termination, and further that the court should not exercise supplemental jurisdiction over the state law claims upon dismissal of the federal claims.

## A. The Facts

Unless otherwise indicated, the facts set forth below are undisputed.

Gary Mazza was employed as a probationary police officer with the NYPD beginning October 15, 1990. He graduated from the Police Academy in April 1991, and entered upon duty as a police officer. Before he developed the colitis condition, plaintiff had been recorded as being out sick on six occasions, leading automatically to his designation by computer as a "chronic category B officer" because of the total number of illnesses and days of work missed within a year.[2]

When plaintiff returned from vacation toward the end of April 1992, he began suffering diarrhea and bloody stool. On May 2, 1992, plaintiff collapsed and was taken to St. Vincent's Medical Center in Staten Island, where he was diagnosed and treated for severe ulcerative colitis. Plaintiff was admitted to St. Vincent's and treated three or four times between May 2 and June 14, 1992, and remained hospitalized for over thirty days in that period. (Pl.Exs.L, M, N). While hospitalized, plaintiff experienced numerous bloody bowel movements, averaging about eight per day during severe periods, and was described as dehydrated and "quite symptomatic" upon his second admission. (Pl. Ex.M). Colitis is inflammation of the colon, part of the gastrointestinal tract. In severe cases, the patient also can experience severe abdominal pain, cramps and "bowel urgency" (a feeling of having to make a bowel movement immediately) in addition to the symptoms described above. (Pl.Ex.P). When symptomatic, a person with colitis will need to relieve himself very suddenly, and can soil himself. During and after his hospitalizations, plaintiff was placed on numerous anti-inflammatory and other medications, including corticosteroids. (Pl.Exs.N, V). Plaintiff continued to be medicated in the following years, and apparently will have to take some medications for the rest of his life. In some cases, medication is not successful in controlling the inflammation and surgery to remove the affected area is required. (Pl.Ex. S, at 5).

Plaintiff in his deposition (Tr. 276–80) described his symptoms during and in the months following his hospitalizations as di-

---

**2.** The parties devote considerable attention to details of these absences and to unsatisfactory performance ratings that plaintiff received; plaintiff endeavors to show that he was treated unfairly by his superiors and discriminated against after being designated "category B," while defendant seeks to portray plaintiff as a poorly-motivated and problematic probationary patrolman with a poor attendance record.

These details are omitted, since they are irrelevant to this motion. There is no genuine factual dispute that the NYPD terminated plaintiff based on his medical condition, not on his performance as a police officer, and it is not disputed that this medical condition was an actual one, whether or not it rose to the level of a "disability" under the ADA (and I find *infra* that it did).

arrhea, loose and bloody stool, cramps (including stomach cramps resulting from medication), nausea, gas, bowel urgency, weight loss, dehydration, fatigue, pain and hemorrhoids. Plaintiff explained that at the relevant time he had good and bad days, and that there were days that he suffered few or no symptoms and other days where he would have to make bowel movements ten times (*Id.* at 279). Plaintiff's affidavit submitted in opposition to the summary judgment motion (at ¶ 45) describes the symptoms he experienced as "severe diarrhea, bloody and loose stool, inflammation, severe cramps, nausea, loss of appetite, loss of weight, gas, severe pain in different degrees, dehydration, fever, sleep deprivation, fatigue, mood changes, sexual disfunction, severe joint pain and anemia, due to loss of blood ... [and] fissures, hemorrhoids and cracks to my rectal area [that] were very painful." He alleges in his affidavit (at ¶ 46) that as a result, he "had difficulty cooking, cleaning, shopping, showering, engaging in personal hygiene, sitting up in bed, washing clothes and changing clothes," avoided "social activities," and was "bedridden" at times. Plaintiff's affidavit fails to describe the degree of "difficulty" he allegedly had in performing these activities.

Plaintiff further testified at his deposition (Tr. 292–93) that his condition improved "around the time of the termination" in February 1993 with the use of the medications. Thereafter, although he suffered flareups, including incidents where he soiled himself, and lacked energy some days, plaintiff's bowel movements and cramping decreased, and his condition did not affect his ability to bathe, go shopping, drive, learn, exercise, do recreational activity or work. (*Id.* at 292–97). Plaintiff maintained that he would have been able to work with only the accommodation of being allowed to use bathrooms as needed. (*Id.* at 300–02). Plaintiff's testimony in this respect differs significantly from the allegations of the complaint, which alleges that his condition rapidly improved after his hospital discharge on June 14, 1992,

that in July he began requesting that he be restored to duty with reasonable accommodations in anticipation of his return to full duty, and that the symptoms of his disease had disappeared before he was terminated (Comp.¶¶ 29–31).

Dr. Stanley Edelman, a NYPD District Surgeon, saw plaintiff on June 29, 1992. He reviewed the hospitalization records that showed that plaintiff had experienced severe episodes of bleeding ulcerative colitis, and that he had been placed on various medications. (Edelman Tr. 26). In subsequent biweekly visits, Dr. Edelman continued plaintiff on sick leave. (*Id.* at 29–31). After plaintiff's visit on August 28, 1992, Dr. Edelman recommended that plaintiff's employment be terminated, a recommendation that plaintiff claims without contradiction was concealed from him before his actual termination almost six months later, although Dr. Edelman continued to meet with plaintiff regularly to extend his sick leave. Dr. Edelman explained that, as of August 28, he had concluded that plaintiff was very sick, that he had a very serious and debilitating case of ulcerative colitis complicated by bleeding, multiple bowel movements and weight loss, and that he would eventually require major colon surgery. Dr. Edelman concluded that plaintiff's prognosis was poor. Plaintiff had failed to improve clinically despite multiple medications, including steroids, and Dr. Edelman felt that plaintiff was unable to work, would be unable to perform the functions of his job in the near future and that his future ability to be a full-duty police officer was in serious doubt. (*Id.* at 29–30, 34).

Dr. Edelman acknowledged that plaintiff would have been capable of doing clerical work if his condition had been under better control with medication, although even then plaintiff's ability to perform the full range of police work remained highly questionable. (*Id.* at 37, 41–42). Dr. Edelman testified that plaintiff had not stated that he was able to work as of the

time that termination was recommended. (*Id.* at 32). Although Dr. Edelman did not recall ever having discussed with plaintiff the possibility of modifying his job duties to enable him to continue working as a police officer (*id.* at 47), the transcript of a conversation between plaintiff and Dr. Edelman in October 1992 shows that in fact, Dr. Edelman had suggested that plaintiff return to light duty or clerical work, perhaps at his local precinct so that he would not have to travel, but that plaintiff insisted he was completely unable to work. (Def.Ex.G). This conversation, and others by plaintiff with Dr. Edelman and another NYPD surgeon, Dr. Leah Dann, were secretly recorded by plaintiff, but plaintiff has not attached transcripts or produced tapes of any of those conversations in his response to the motion although he uses a few selected purported quotations from those conversations to claim that he was not treated fairly. The tapes were turned over to defendant in discovery. The transcript of the above conversation prepared by defendant even quotes Dr. Edelman referring to the obligation of the NYPD under the ADA to accommodate someone with colitis who was able to perform some work. Dr. Edelman stated, "I don't know why you're not able to—sit at a desk and answer a telephone." Plaintiff responded, "It's pretty obvious," but Dr. Edelman replied, "No, it isn't obvious." (Def.Ex.G, p. 5).

Notwithstanding this tape, plaintiff insists in general terms that, before February 1993, he had requested to be allowed to return to work with the accommodation of being allowed to work near a bathroom. (Mazza Aff. ¶ 51). He fails to identify to whom he communicated this request, or when. Instead, plaintiff's affidavit cites to paragraph 30 of the complaint, which as noted above, is refuted by his own deposition testimony, and also cites to pages of his deposition testimony that likewise do not identify any communications. Plaintiff's affidavit (at ¶ 52) then proceeds to quote from the affidavit he gave before the EEOC (Pl.Ex.T), which like the complaint is hearsay in this proceeding, and plaintiff does not now swear to its truth. Plaintiff asserted in his EEOC affidavit that, in October 1992, he had requested of Dr. Edelman that he be allowed to return to work with an accommodation, but was not allowed to—which is directly contrary to the recorded conversation described above. Plaintiff has not attempted in his papers to explain this recorded conversation and, significantly, plaintiff has not attempted to explain his inability to produce a recorded conversation that corroborates his claim although he "routinely tape recorded the conversations" with NYPD doctors without their knowledge. (Mazza Aff. ¶ 75). Plaintiff's EEOC affidavit also claimed that in December 1992, plaintiff's father had requested of NYPD Surgeon Dr. Leah Dann that plaintiff be allowed to return to work with accommodation, but plaintiff has not submitted any evidence of that alleged conversation in response to the summary judgment motion.

Plaintiff also alleges that he was lulled by the NYPD surgeons into believing that his job was not in jeopardy before he was terminated. He quotes Dr. Edelman and Dr. Dann on October 6, 1992, as assuring him that no one was interested in terminating him now, he should not worry, and that maybe if there was no improvement in six months they would have to "look hard" at his situation. (*Id.*). Plaintiff further quotes Dr. Edelman as telling plaintiff and plaintiff's father in a recorded telephone conversation on November 20 that plaintiff would be returning to work the next week, and Dr. Edelman would try to arrange for plaintiff to work at his local precinct. (*Id.* ¶ 76). Yet, plaintiff does not attempt to explain why he did not in fact return to work in the week after November 20. Plaintiff also does not assert that he had followup discussions with anyone when he did not return to work as Dr. Edelman had allegedly promised, as would have been expected if plaintiff wanted to and was able to return to work. Plaintiff does not submit transcripts of these conversations.

On December 10, 1992, Dr. Dann recommended that plaintiff be terminated. (Def.Ex.A). Her memorandum to the Supervising Chief Surgeon states that plaintiff had been out sick since May 2 with active inflammatory bowel disease, "has a biopsy proven IBD and has had cramps and bloody diarrhea (6–8 times/day) since then," and was on corticosteroids and 6–mercaptopurine (a drug that affects immune cells involved in inflamation, see Pl. Ex. S at 4–5). Dr. Dann recommended termination in view of plaintiff's "continued disease activity, with no possibility to be restored to full duty in the near future" after being out sick for seven months. Dr. Robert Thomas, the Supervising Chief Surgeon, concurred, noting plaintiff's "serious intestinal condition," his required "use of strong therapeutic agents which have the potential of serious side effects," and the fact that his disease still was not in remission despite these measures.

Plaintiff's treating physician, Dr. Prasanna Wickremesinghe, gave plaintiff a note dated January 6, 1993, which plaintiff submitted to the NYPD, reading as follows: "This patient is still under intensive medical therapy for chronic universal ulcerative colitis. Should he respond favorably he will be able to resume his previous duties with some accommodations." (Pl. Ex.U). Although *plaintiff* asserts that Dr. Wickremesinghe "intended to mean that I was responding favorably and that I could then return to duty with some accommodation," (Mazza Aff. ¶54), the note clearly does not so state, nor has Dr. Wickremesinghe supported plaintiff's interpretation of the note even though he has submitted other statements on plaintiff's behalf. (Pl. Ex.V).

In March 1993, after plaintiff's employment had been terminated on February 25, medical testing revealed that plaintiff's colitis had improved substantially. (Pl. Exs.DD, EE, FF). His symptoms thereafter were controlled more successfully with medication, and his doctors determined that surgery was not needed. Plaintiff has submitted letters from doctors that describe this improvement or the prognosis for a typical patient with colitis (Pl.Ex.V) but, contrary to plaintiff's characterizations, those letters do not offer opinions on the severity of plaintiff's condition or his ability to work before he was terminated. The letter most favorable to plaintiff was submitted by Dr. David Sachar, Professor of Medicine, Director of the Division of Gastroenterology and Vice Chairman of the Department of Medicine at Mount Sinai Hospital. (Pl.Ex.DD). Dr. Sachar did not examine plaintiff until 1995, but upon review of the medical records, he asserted that the decision to terminate plaintiff based on "his successful treatment program ... seems to me unjustifiable in science, law, or common sense."[3] Other letters simply offer observations as to the ability of a typical individual who has colitis to work, and that ulcerative colitis does not automatically exclude an individual from police work. (Pl.Ex.V).[4]

## B. Discussion

### 1. Standard of Review

Summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548,

---

3. Dr. Sachar's letter also states: "Needless to say, the fact that Mr. Mazza's condition suddenly and unexpectedly deteriorated years later following a Salmonella infection is totally irrelevant to the question of his termination in January 1993." This later event is not mentioned elsewhere in the record.

4. Defendant challenges the admissibility of two letters from doctors that state that plaintiff has "chronic universal ulcerative colitis" and briefly address the condition generally. These letters are worded identically and are not signed. (Pl.Exs.Q, R). Since the information they contain is cumulative of information otherwise part of the record, the objection need not be considered.

91 L.Ed.2d 265 (1986). In evaluating whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). These standards are applicable to the resolution of summary judgment motions involving ADA claims. *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149 (2d Cir.1998).

## 2. Disability Discrimination Under the ADA

This court recently reviewed the requirements for a plaintiff to establish a *prima facie* case of disability discrimination under the ADA:

> The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees...." 42 U.S.C. § 12112(a). A plaintiff bringing a claim of discriminatory discharge under the ADA bears the initial burden of establishing a prima facie case of discrimination. To meet this burden, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability. *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998). The ADA describes an individual as suffering from a "disability" if she makes a showing of any one of the following: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "Only a 'qualified individual with a disability' may state a claim for discrimination under the ADA;" even if a plaintiff

alleges a firing because of a medical condition, she can bring a claim under the ADA only if her medical condition rises to the level of a "disability." *Parker v. Sony Pictures Entertainment, Inc.*, 19 F.Supp.2d 141, 147 (S.D.N.Y. 1998) [*rev'd in part on other grounds sub nom. Parker v. Columbia Pictures Indus.*, 204 F.3d 326 (2d Cir.2000).]

*Sacay v. Research Found. of the City Univ. of New York*, 44 F.Supp.2d 496, 500 (E.D.N.Y.1999).

### a. Disability

Defendant argues that plaintiff has failed to produce evidence raising a factual issue that he suffers from a "disability" within the meaning of the ADA. In making this argument, defendant flatly contradicts its position before the EEOC, where it successfully urged that plaintiff was so disabled that his termination without accommodation was justified. The argument is without merit because plaintiff has produced sufficient evidence that he was actually impaired, and also that he was regarded as being impaired, within the meaning of subsections (a) and (c) of 42 U.S.C. § 12102(2) quoted above.

 In evaluating a claim of disability under the ADA, the court follows a three-step process to determine: (1) whether plaintiff had an impairment; (2) whether the impairment affected a "major life activity" within the meaning of the ADA; and (3) whether that major life activity was substantially limited by the impairment. *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Sacay*, 44 F.Supp.2d at 500.

 Plaintiff has an impairment, defined in the regulations under the ADA as including "[a]ny physiological disorder, or condition" affecting the digestive system. 29 C.F.R. 1630.2(h)(1); *Johnson v. New York Med. College*, 1997 WL 580708, at *5 (S.D.N.Y.1997) ("the Court is convinced that colitis is a 'physical impairment' within the meaning of the ADA").

The evidence also would support a finding that the impairment affected "major life activities," which includes under the regulations functions such as "caring for oneself" and "working". 29 C.F.R. 1630.2(i). The Supreme Court has recently questioned the authoritativeness and persuasiveness of the regulations and EEOC interpretations, and specifically has questioned the inclusion of "working," *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999), but the Second Circuit in post-*Sutton* decisions has continued to view the regulations and agency interpretations as entitled to substantial deference in interpreting the ADA, and has specifically continued to treat working as a major life activity. *Heyman v. Queens Village Comm. for Mental Health,* 198 F.3d 68, 72–73 (2d Cir.1999); *Muller v. Costello,* 187 F.3d 298, 312 & n. 5 (2d Cir.1999).

In *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 871 (2d Cir.1998), the Circuit assumed without deciding that "the ability to control one's elimination of waste is a major life activity," but then proceeded to find that plaintiff had failed to raise a triable issue of fact that her colitis was a substantial limitation upon that activity, or that other major life activities were substantially limited. The symptoms described by plaintiff in this case, supported by the medical evidence in this record, satisfy the court that the trier of fact could find that plaintiff's impairment affected major life activities.

Plaintiff has also introduced sufficient evidence to create a triable issue of fact that he was "substantially" limited in the activities of controlling elimination of wastes and working. *Ryan* emphasized that its decision against plaintiff was limited to its facts, where Ryan was asymptomatic for long periods,-suffered severe symptoms only in the summer, and did not miss work because of her colitis. *Id.* at 871–72. The court described its determination as "fact specific," explaining that it "does not mean that colitis may never impose such a limitation." *Id.* at 872; *see Reeves,* 140 F.3d at 151–52 (describing *Ryan* as mandating case-by-case inquiry of the effect of colitis on the major life activity of the individual's ability to care for oneself). Other cases which have evaluated colitis or similar conditions, and that have reached differing results, similarly are fact-specific. *See Johnson v. New York Med. College, supra* (summary judgment granted against plaintiff whose colitis did not affect her ability to work); *Caporilli v. City of Rome,* 1992 WL 209327 (N.D.N.Y.1992) (finding for defendant after non-jury trial); *Ferguson v. West Carolina Reg'l Sewer Auth.,* 914 F.Supp. 1297 (D.S.C.), *aff'd mem. on other grounds,* 104 F.3d 358 (4th Cir.1996) (summary judgment against plaintiff with "irritable bowel syndrome" and other ailments); *Jones v. Hodel,* 711 F.Supp. 1048, 1048–49 (D.Utah 1989) (plaintiff who had colon removed because of chronic ulcerative colitis is disabled); *Branch v. City of New Orleans,* 1995 WL 295320 (E.D.La.1995), *aff'd mem.,* 78 F.3d 582 (5th Cir.1996) (jury verdict in favor of defendants sustained where plaintiff's symptoms were in remission). In *Sacay,* 44 F.Supp.2d at 501–02 & n. 1, similarly, this court dismissed the complaint for failure to set forth factual allegations that were necessary to allege that plaintiff's colitis and other ailments substantially limited a major life activity.

In this case, plaintiff has described severe limitations upon his ability to control elimination of wastes and to work during the relevant period, and the hospital records and undisputed medical evidence substantiate the severity of his condition. A trier of fact could reasonably find that plaintiff was disabled.

■ Plaintiff has failed to create a triable issue that he was substantially limited in the major life activity of caring for oneself. Plaintiff's conclusory assertion in his affidavit, unsupported by any details or by his deposition testimony, that he had "difficulty" in performing such routine tasks as cooking, cleaning, shopping and

showering is insufficient to make a *prima facie* showing that his ability to care for himself was substantially limited. *Ryan,* 135 F.3d at 871–72.

■ The court also concludes, in the alternative, that plaintiff has presented sufficient evidence to show that he has a disability under the ADA because defendant regarded him as having an impairment which substantially limited major life activities, not just his ability to perform a particular specialized job. *See Murphy v. United Parcel Serv.,* 527 U.S. 516, 119 S.Ct. 2133, 2137–38, 144 L.Ed.2d 484(1999); *Heyman,* 198 F.3d at 73; *Reeves,* 140 F.3d at 153–54. Since defendant terminated plaintiff in the belief that plaintiff was seriously disabled, unable to work, and that his prognosis was poor, defendant cannot now claim that there is not even a genuine factual issue concerning whether defendant regarded plaintiff as disabled.

### b. Qualified Individual

Plaintiff has failed to present sufficient evidence to create a triable factual issue that he was able to perform the essential functions of his position, with or without accommodation. Therefore, defendant is entitled to summary judgment on this issue.

■ An individual is not qualified for his position if he is unable to come to work. *Bobrowsky v. New York City Bd. of Educ.,* 1999 WL 737919, at *4 (E.D.N.Y. 1999), *aff'd mem.,* 213 F.3d 625 (2d Cir. 2000) ("[t]here could be no reasonable accommodation because attendance is an essential function of her employment"); *Daddazio v. Katherine Gibbs Sch., Inc.,* 1999 WL 228344, at *5 (S.D.N.Y.1999), *aff'd mem.,* 205 F.3d 1322 (2d Cir.2000) (" '[r]egularly attending work' is an essential function of virtually every job"); *Querry v. Messar,* 14 F.Supp.2d 437, 444–45 (S.D.N.Y.1998) (ADA does not require an employer to accommodate an employee who cannot get to work). Moreover, the

ADA does not require that a position be kept "open indefinitely" while an employee convalesces. *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 338 (2d Cir.2000).

■ Plaintiff offers no medical or other evidence to support his conclusory claim in this action that he was able to work at the time of his termination. On the contrary, the note from plaintiff's treating physician, Dr. Wickremesinghe, states that plaintiff would be able to return to his duties with accommodations *if* he responded favorably to intensive medical therapy. The clear import of this note, written after plaintiff had missed work for eight months following his first hospitalization for colitis, is that plaintiff still could not report for work even with accommodations, and it was not yet known if plaintiff would be able to do so in the future. Moreover, since plaintiff had already undergone intensive medical therapy for most of this eight month period and remained unable to work, Dr. Wickremesinghe's note did not provide a basis for optimism. It necessarily confirmed the evaluation of NYPD physicians that plaintiff's prognosis was poor. Plaintiff's interpretation of Dr. Wickremesinghe's note, as meaning that plaintiff had improved and was now able to work with accommodations, is contradicted by the plain language of the note, not supported by other statements plaintiff has submitted from that doctor, and does not create a genuine factual issue concerning plaintiff's ability to work.

That plaintiff's condition improved following his termination cannot overcome the undisputed evidence from the earlier time period that plaintiff was not qualified to perform the essential functions of his position, and was not able to report for work at all. Plaintiff cannot salvage his claim with his bald assertion of a belief that he was able to work at the time, unsupported by any medical or other objective evidence. *See Daddazio,* at *5 (granting summary judgment dismissing ADA claim where plaintiff's "conclusory statement" that he was able to perform the

essential functions of his job was "belied by the evidence that plaintiff himself has submitted for the Court's review," including medical evidence).

Since plaintiff has failed to raise a genuine issue of fact concerning his ability to come to work at all, it is unnecessary to consider defendant's argument that plaintiff was not qualified to perform the essential functions of the specialized occupation of police officer, and therefore was properly terminated even if he had been able to do administrative work. *Cf. Stone v. City of Mount Vernon,* 118 F.3d 92 (2d Cir. 1997), *cert. denied,* 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998) (analyzing possible duty to accommodate paraplegic firefighter by assignment to specialized bureau).

### c. Reasonable Accommodation

██ A claim of disability discrimination arising from termination of an employee based on failure to accommodate is not made out under the ADA unless the employee's request for a reasonable accommodation has been denied by the employer. As explained in *Parker,* 204 F.3d at 338, the duty to make reasonable accommodations does not require an employer to hold open a disabled employee's position indefinitely, nor does it require the employer "to investigate every aspect of an employee's condition before terminating him based on his inability to work." The ADA does require that when an employee proposes an accommodation weeks before termination, the employer is obligated to "investigate that request and determine its feasibility. An employer who fails to do so, and instead terminates the employee based on exhaustion of leave, has discriminated 'because of' disability within the meaning of the ADA." *Id.; see Lanci v. Arthur Andersen, LLP,* 2000 WL 329226, at * 8 (S.D.N.Y.2000) (duty of employee to request reasonable accommodation); *Baker v. City of New York,* 1999 WL 33115, at *4 (E.D.N.Y.1999) (same); *DeMar v. Car–Freshner Corp.,* 49

F.Supp.2d 84, 95–96 (N.D.N.Y.1999) (employee who fails to request an accommodation of employer cannot hold employer liable for failing to provide one). *But cf. Durant v. Chemical/Chase Bank/Manhattan, N.A.,* 81 F.Supp.2d 518 (S.D.N.Y. 2000) (denying summary judgment even though employee disabled by depression had not tried to return to work and had not requested an accommodation before she was terminated).

██ Defendant is entitled to summary judgment on this issue. As the review of the facts demonstrates, plaintiff has failed to present any genuine issue of disputed fact concerning his alleged requests for an accommodation. Even if the EEOC affidavit were taken as sworn to in this action, the plaintiff's claim that he made a request for accommodation from Dr. Edelman is not on any of the tapes. In fact, the only tape presented on this motion that refers to an accommodation shows the opposite. In that tape, plaintiff rejects Dr. Edelman's suggestion that he return to work at a desk job or other restricted duty. Plaintiff admits that he "routinely tape recorded the conversations" with NYPD physicians (Mazza Aff. ¶ 75). If a conversation took place such as plaintiff described in his EEOC affidavit, he would have been able to produce a tape and transcript of that conversation. Plaintiff has not done so, nor has he attempted to explain his inability to do so. Moreover, plaintiff has not reaffirmed the truth of his statements in the EEOC affidavit in the sworn statement he submitted in opposition to the summary judgment motion. Plaintiff also has not attempted to identify the alleged conversations by date or participants in response to the summary judgment motion. The transcript of plaintiff's conversation with Dr. Edelman, in which plaintiff resists any effort to return to work with reasonable accommodations, is neither challenged nor explained, and completely undermines his position. Having-continued plaintiff on sick leave for almost ten months with no request by plaintiff to return to work in

any capacity, without any indication from plaintiff that he could resume his duties soon, and having been presented with evidence of plaintiff's serious medical condition and no evidence that it had improved or was expected to improve imminently, defendant did not engage in unlawful discrimination when it discharged plaintiff.

### Conclusion

The motion of the defendants for summary judgment on the ADA claim is granted. The court declines to exercise supplemental jurisdiction over the remaining claims which, as plaintiff acknowledged at oral argument, are based only on state statutory and constitutional law and common-law breach of contract. Those claims are dismissed without prejudice to their being brought in state court.

**SO ORDERED.**