STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-00-239

CATHY DOYLE,

      Plaintiff

v.

STATE OF MAINE, DEPARTMENT OF
HUMAN SERVICES

      Defendant

**DECISION AND ORDER**

DONALD L. GARBRECHT
LAW LIBRARY

JUL 18 2002

This matter is before the court on defendant's motion for summary judgment. The defendant requests summary judgment on the grounds that: (1) the State of Maine is immune from claims under the American with Disabilities Act (ADA); (2) the plaintiff has failed to establish herself as "qualified individual with disability" under the Maine Human Rights Act (MHRA); (3) the plaintiff cannot show unlawful discrimination (MHRA); and (4) the plaintiff cannot show unlawful retaliation (MHRA). For the reasons discussed below, the court grants the defendant's motion for summary judgment.

I.     **Facts and Procedural History**

The following factual summary is based on the parties' statements of material fact and is undisputed unless otherwise noted. The plaintiff, Cathy Doyle, was employed by the State of Maine - with several breaks in service - from 1977. In November, 1998, the plaintiff was promoted from Clerk-Typist II in the Department of Human Services to a Clerk III position within the Bureau of Medical Services' Inquiry

Unit. Beth Ketch was the supervisor of DHS' Provider and Consumer Relations Unit which included the Inquiry Unit. At the time Doyle was hired, she requested that her work hours be changed to 7:30 a.m. to 4:00 p.m. to accommodate a medical condition. Ketch had no knowledge of the nature of Doyle's medical condition until December 18, 1998.[1]

India Kiesow was hired as Clerk IV in the Inquiry Unit on December 7, 1998. Kiesow was the supervisor of the Clerk IIIs in the Inquiry Unit (including Doyle). This was Kiesow's first assignment as a supervisor.

The volume of calls for the Clerk IIIs averaged 300-400 calls per day[2]

Doyle was diagnosed with severe ulcerative colitis in 1988, and had her large intestine and rectum removed in 1995. She has an internal reservoir (J-pouch) for waste constructed out of a portion of her small intestines. Doyle is able to sit, stand, walk, think, and concentrate. She does not follow a particular diet but must introduce foods one at a time to determine whether she can tolerate them. She has no lifting restrictions. At certain times, running, jumping or heavy lifting may cause leaking (which can require medical treatment). Doyle usually has to go to the bathroom between 10 and 25 times in a 24 hour period, including several times in the night.

Doyle was in probationary status during her employment as Clerk III in the Inquiry Unit. The Inquiry Unit is responsible for answering phones and doing research for claims to find out why they have not been paid. The Clerk III positions within the Inquiry Unit are responsible for answering the telephone lines for Medicaid providers and consumers. At the time Doyle was hired into the Inquiry Unit, the unit was short-

[1]The plaintiff cites her own deposition to dispute this fact, but the record reference cited does not support her factual assertions.

[2] It is unclear from the record reference whether this was per clerk or for all clerks combined.

2

staffed. There is a factual dispute as to whether the policy of the Inquiry Unit was that Clerk IIIs were to answer questions or take messages on any calls that they were not able to answer immediately and to give the message to the provider relations specialist to return the call. Doyle does testify that at the December 14 meeting, discussed below, Kiesow told them not to ask the provider specialist, but to take a message.

On December 14, Kiesow held a staff meeting at which Doyle was present. During the course of the meeting, Kiesow reviewed a set of guidelines for the staff and distributed a copy to Doyle. The guidelines included instructions regarding "logging on," "logging off," and working in the "unavailable mode." The unavailable mode was to be used only for short absences from the phone (e.g., restroom break, or to make a quick copy) and not for breaks or lunch. According to the guidelines, staff's calls out were to be limited to between 4-5 p.m. when it was not busy, but Ketch testified that staff could make outgoing calls, if they needed to, when it was not busy. Staff was instructed that because of the volume of calls, they were to take messages with respect to any inquiries that they were not able to answer and not to ask questions of the provider relations specialists. There was not a blanket moratorium on inquiry unit staff asking questions of provider relation' specialists. All inquiry unit staff asked questions of provider relation's specialists, however Doyle was the only one who was reprimanded or demoted for doing so.[3] PSMF ¶ 9.[4]

The next day, December 15, Kiesow observed Doyle going to the unavailable

---

[3] The evidence cited to support these factual assertions has been challenged by the defendant. Specifically the defendant asserts that certain identified passages in the affidavits of Doyle, Wellton, and Gagnon are based on hearsay and lack foundation.

[4] Doyle asserts additional facts as to the contents of her instructions and whether she complied with instructions about logging in and off, but the deposition passages cited do not support her factual assertions.

mode for about 4 minutes and speaking to one of the provider relations specialists in direct contradiction to what Kiesow had told the staff, including Doyle, the day before.[5] Doyle disputes that it was in violation of the guidelines to do so.

On December 16, Kiesow spoke to Doyle about her failure to follow the guidelines reviewed with her (and others) on December 14. Doyle responded that she could not do her job unless she could talk to the provider relations specialists.

On December 17, Kiesow decided to counsel Doyle about her misuse of the "unavailable" mode on the phone, her poor attitude, not being available to answer the phones during her workday, and issues of time management. Kiesow e-mailed Ketch about her intent to do so, and Ketch wrote that she would support Kiesow's decision. Kiesow prepared a document called "Record of Employee Performance" outlining the issues.

On December 18, Kiesow met with Doyle, and Ketch joined them at Doyle's request. It was during this meeting that Ketch and Kiesow learned that Doyle had a J-pouch and needed to use the bathroom frequently. They told her she could use the bathroom whenever she needed, and Kiesow would cover Doyle's phone. Doyle would not sign the form at the close of the meeting. The document stated that if Doyle's performance did not improve her probation might be in jeopardy. Kiesow, Ketch and Doyle planned to meet on January 8, 1999 to discuss Doyle's progress.

There is a factual issue with respect to Doyle's behavior in a subsequent training session with Jane Bryson. Bryson claims that Doyle exhibited a poor attitude, and asked non-work related questions, even after Bryson informed Doyle that Bryson was

---

5 Doyle disputes the fact that she was observed breaking the rules, but the deposition passages cited do not support Doyle's factual assertions.

following an agenda. Doyle asserts that she stopped asking questions when she was asked to stop. Bryson had no knowledge of Doyle's medical condition. Bryson reported the incident to Ketch.

Kiesow insists that when she asked Doyle a question or to perform a task, Doyle was hostile and would roll her eyes. Even after the counseling session, Doyle talked to provider relations specialists instead of taking messages. She reportedly became too involved with Medicaid recipients, resulting in a backlog of phone calls. Doyle was frequently reading and writing e-mail, which was unnecessary for her job and resulted in a delay in her ability to pull up the computer database necessary to respond to telephone inquiries.[6]

As a supervisor, Ketch would monitor the calls of Inquiry Unit staff, including those of Doyle. Staff was aware that calls would be monitored. Ketch heard Doyle give out incorrect information to a provider using outdated information from a Rolodex that staff had been instructed not to use. Ketch heard Doyle give out in-house staff notes relating to a dental provider to a Medicaid recipient seeking a referral. Ketch heard Doyle making personal calls when she was not on break or at lunch, and at a time when there was a backlog of incoming calls.[7]

On December 22, Doyle contacted Tom Meiser, Director of Human Resources, regarding her need to get up and move around due to her medical condition. Ketch and Kiesow met with Doyle on December 23 and they told her to get up as needed, use

---

[6] Doyle disputes some of the factual assertions of this paragraph, but cites to pages of her deposition that do not completely support her factual assertions.

[7] Doyle disputes some of the factual assertions of this paragraph, but cites to pages of her deposition that do not completely support her factual assertions.

the restroom whenever necessary and requested she bring in a doctor's note.[8] On January 7, 1999, Doyle e-mailed Kiesow and asked what she should do if she needed to use the restroom and Kiesow was unavailable to cover her calls. Kiesow replied that she should "go anyway." Sometime in late December or early January, Doyle referred a call to Bryson after being told to refer it to another employee. Doyle also left a message regarding that call in Bryson's message box instead of the other employee's box.

On January 11, 1999, Kiesow, Ketch and James Lewis, the Assistant Bureau Director, met with Doyle. They reviewed her Performance Management form that had been prepared by Kiesow and decided to terminate Doyle's probation and return her to her prior position as a Clerk-Typist II.

On November 9, 2000, Doyle filed this civil action in Kennebec County Superior Court alleging that State had illegally discriminated against her because of her disability and had terminated her probation in retaliation for her request for reasonable accommodation.

## II.   Discussion

A summary judgment is proper if the citations to the record found in the parties' Rule 56(h) statements demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Dickinson v. Clark,* 2001 ME 49, ¶ 4, 767 A.2d 303. To avoid a judgment as a matter of law for a defendant, a plaintiff must establish a prima facie case for each element of her cause of action. *Fleming v. Gardner,* 658 A.2d 1074, 1076 (Me. 1995). As an initial matter, the

---

[8] The plaintiff reportedly complied with this request, but no documentation from a physician has been included in the materials currently before the court.

plaintiff did not comply with M.R. Civ. P. 56, which provides that, in responding to a movant's statement of material facts, the opponent may include "in a separate section additional facts, set forth in separate numbered paragraphs and supported by record citation as required by paragraph (4) of this rule." Here, the plaintiff included additional facts (those that do not directly dispute, admit, or qualify the facts contained in the defendant's statement of material facts) in her purported response to each fact asserted by the defendant. In addition, or perhaps in conjunction with this error, the plaintiff used an erroneous numbering system - for example, the plaintiff continued to respond to paragraph 16 of the DSMF in paragraph 17 of the PSMF, etc. Failure to controvert specific paragraphs in the moving party's statement of material facts constitutes noncompliance with M.R. Civ. P. 7(d)(2) and will result in the facts not properly controverted being deemed admitted. *Pratt v. Ottum*, 2000 ME 203, ¶ 15 n.8, 761 A.2d 313, 318; *Prescott v. State Tax Assessor*, 1998 ME 250, ¶ 6, 721 A.2d 169, 172. The court has no independent duty to search or consider any part of the record not referenced in the parties' statements of facts. *Dumont v. Fleet Bank*, 2000 ME 197, ¶ 13, 760 A.2d 1049, 1053-54.

Also, the defendant has moved to strike several portions of the plaintiff's supporting affidavits because they are based on inadmissible hearsay or are lacking in foundation. M.R. Civ. P. 56 requires supporting affidavits to be based on admissible evidence. Accordingly, the court, in its own discretion, may exclude those portions of the record that it deems inadmissible thereby rendering the defendant's motion to strike redundant and unnecessary.

I.    Discrimination claims

The plaintiff claims she was discriminated against by her employer because of

her actual or perceived disability. In order to establish a prima facie case of discrimination, she must show that (1) she suffers from a disability as defined under the MHRA or the ADA; (2) she is otherwise qualified, with or without reasonable accommodation, and is able to perform the essential functions of the job; and (3) her employer discriminated against her because of her disability. *Soileau v. Guilford of Maine, Inc.,* 928 F. Supp. 37, 45-46 (D.Me. 1996).

A.    Whether the plaintiff is disabled under the ADA.

The defendant argues that the plaintiff is not disabled because there is no substantial limitation of a major life activity. 29 C.F.R. § 1630.2(j). At oral argument on this motion, the plaintiff conceded that the recent U.S. Supreme Court case of *University of Alabama v. Garrett*[9] is dispositive of this claim. Therefore, judgment shall be entered for the defendant on that part of the plaintiff's claim that is based directly on the Americans with Disabilities Act (ADA).

B.    Whether the plaintiff is a qualified individual with a disability under the MHRA.

The defendant argues that the plaintiff is not a "qualified person with a disability" because she is not able to show that she was able to perform essential functions of the position with reasonable accommodation (answering high volume of calls which required her to be next to a computer when answering the calls).

A qualified person with a disability is defined as "[a]n individual with a physical or mental illness who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." 5 M.R.S.A. § 4553. A physical or mental disability is defined by the Maine Human Rights

---

[9] 121 S.Ct. 955 (2001) (holding states immune from liability under Title I of the ADA).

Commission, which tracks the language of the ADA,[10] as a "physical or mental impairment which substantially limits one or more of such persons major life activities, has a record of such impairment, or is regarded as having such impairment." Me. Hum. Rights Comm. Rules, ch. 3, § 3.02(C)(1); 42 U.S.C. § 12102(2).[11] The plaintiff seeks relief under the first prong and, by motion to amend which this court now denies, the third or "regarded as" prong.[12]

There is no dispute here that the plaintiff suffers from a physical impairment. She has had a substantial portion of her colon removed and must use a J-pouch to eliminate waste. Colitis has been considered a disability by some courts, *see Mazza v. Bratton*, 108 F.Supp.2d 167 (D.N.Y. 2000), and not a disability by others, *see Ryan v. Grae and Rybicki*, 135 F.3d 867 (2nd Cir. 1998); *Ferguson v. Western Carolina Regional Sewer Authority*, 914 F.Supp 1297 (D.Ak. 1996). A determination of whether an individual has a disability requires a case by case inquiry. "[I]n assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments which merely affect

---

[10] Because Maine frequently looks to federal law to interpret anti-discrimination statutes and because the MHRA is fashioned after the ADA, the court will use the ADA to help determine the plaintiff's status without pausing to distinguish between the ADA and the MHRA at each turn. *See Soileau v. Guilford of Maine, Inc.*, 928 F.Supp. 37, 45 (D.Me. 1996).

[11] Physical impairment is further defined as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory; genitourinary; hemic and lymphatic; skin; and endocrine." Me Hum. Rights Comm. Rules, ch. 3, § 3.02(C)(2)(a).

[12] The court will consider all three prongs of the analysis articulated in the language of the ADA. The plaintiff's motion to amend the complaint requests leave to specifically add a count to included the "regarded as " language. However, the court notes that in her reply memorandum and at oral argument, the plaintiff maintained that the amendment would not add additional claims, but would simply serve to clarify the complaint. She asserts that she has already set forth sufficient facts and allegations to sustain a claim under the "regarded as" standard. "Whether to allow a pleading amendment rests with the court's sound discretion." *Kelly v Michaud's Ins. Agency, Inc.*, 651 A.2d 345, 347 (Me. 1994) (citing *Diversified Foods, Inc. v. First Nat'l Bank of Boston*, 605 A.2d 609, 616 (Me.1992)). As the court will review the plaintiff's allegations in the light most favorable to her, as the nonmoving party, while examining all three prongs of the ADA definition of disability, the motion to amend is superfluous and will be denied.

major life activities from those that substantially limit those activities." *Ryan v. Grae and Rybicki,* 135 F.3d at 870 (citations omitted). The court must examine then whether the plaintiff's impairment substantially limits one or more major life activities. The major life activities listed in the Me. Hum. Rights Comm. Rules and the ADA include, but are not limited to, "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Me. Hum. Rights Comm. Rules, ch.3 § 3.02(C)(2)(b); 29 C.F.R. § 1630.2(i). The plaintiff argues that two major life activities are limited by her condition: digestion/elimination of waste and working. While elimination of waste is not one of the enumerated activities listed in the ADA, the court will assume, strictly for the purpose of providing full analysis in this instance and on these facts, that elimination of waste may be considered a major life activity.

The court then must consider the three factors provided in the regulations that establish whether the plaintiff's condition substantially limits the activity being examined. The three factors are (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

Under the claim concerning elimination of waste, the first factor is easily evaluated as the very condition that the plaintiff suffers from directly affects the activity she claims is limited. She has testified that she must use the restroom frequently throughout the day, approximately 25 times in a 24 hour period, including two separate one-hour visits to clean the J-pouch. She must get up and move around often in order to avoid blockages. Every few months she develops "pouchitis" which causes burning and infection. Occasionally she suffers blockages that cause pain and vomiting and may

10

require hospitalization.

The second factor of this test is also easy to determine as the plaintiff has testified that, while the pain and need for hospitalization is episodic, her condition is permanent and she will be required to use the J-pouch for the rest of her life.

The third factor, the assessment of long term impact, also tips toward a finding of substantial limitation as the plaintiff will continue to suffer the nature and effects of her condition for the foreseeable future. Accordingly, as the plaintiff's condition is permanent, severe, and will have a long term impact on her life, the court finds the plaintiff suffers from an impairment that substantially limits her ability to control her digestion and elimination of waste.

The other major life activity in which the plaintiff claims substantial limitation is working. The standard governing whether an impaired person is substantially limited in the ability to work is found at 29 C.F.R. § 1630.2(j)(3)(i) which states "[w]ith respect to the major life activity of working . . .[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Under this standard, the plaintiff must show that her physical condition restrict her from performing a range or class of jobs.

While the plaintiff contends she is not able to work most clerical jobs, her job history provides evidence to the contrary. She has been employed by the State for over 25 years and has received good performance reviews in each position she has held. Prior to her promotion to Clerk-Typist III, she was employed by DHS as a Clerk-

Typist II, and after her probationary period was terminated, she was returned to her previous position.

Additional considerations that the court may take into account in assessing the plaintiff's ability to work generally include: (A) the geographical area to which the individual has reasonable access; (B) the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment . . . 29 C.F.R. § 1630.2(j)(3)(ii). The plaintiff must provide evidence to establish these factors referencing general employment demographics to give the court an indication of the approximate number of jobs she would be excluded from because of her impairment. The plaintiff's general allegations that she is disqualified from most clerical jobs because her hygiene schedule requires a 7:30 a.m. to 4:00 p.m. workday and that, combined with frequent bathroom usage and occasional leaves of absence, limits her to jobs that can provide adequate accommodation, is insufficient to meet this burden. She has testified that she is limited in running, jumping, bending and lifting, but these restrictions have little impact on her clerical abilities and are insufficient to establish a barrier to her employment. Accordingly, as the plaintiff is able to work in a clerical capacity, utilizing her skill and abilities gained over years of experience, she has failed to show that she is unable to perform a class of jobs, or that she is substantially limited in her ability to work generally.

C.     Whether the plaintiff is regarded as a having a disability.

As the second prong of the ADA definition of disability, whether the plaintiff has a record of such impairment, is inapplicable here, the court's examination now turns to

the third prong of the analysis: whether the plaintiff is "regarded as" having a physical impairment which substantially limits one or more major life activities. The regulations define someone who is "regarded as having an impairment" as someone who (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has none of the impairments defined in paragraphs (h) (1) or (2) [see footnote 11], but is treated by a covered entity as having a substantially limiting impairment. 29 C.F.R. § 1630.2(l).

"The proper focus of the 'regarded as' provision is on the impairment's effect upon the attitudes of others." *Soileau*, 928 F. Supp. at 52. The plaintiff's supervisors first learned of the existence of her J-pouch and her need for free access to the restroom on December 18, 1998, at a meeting held to discuss her job performance.[13] At a second meeting on December 23, her supervisors learned of her request to be able to get up and move around when necessary. Both requests were granted. The only evidence adduced by the plaintiff in support of her claim centers on a remark made by Kiesow, her immediate supervisor, that she should use the restroom as needed because "I am not going to clean it up." DSMF, ¶ 13. The plaintiff has presented no evidence that her employer considered her limited in her general ability to work; in fact she was returned to her old job as Clerk-Typist II. Here again, the court must examine whether the

---

[13] The plaintiff denies this is the first instance in which her supervisors learned of her condition. She relates a conversation with Kiesow that took place at her desk in which she reportedly provided the specifics of her condition in response to a question regarding her non-standard work hours. She maintains that the conversation took place shortly after Kiesow became her supervisor. An examination of her testimony reveals that she did not make any reference in her conversation to her need for free access to the restroom or to be able to get up and move around. Doyle depo., pp. 51-52. Kiesow insists she first became aware of Doyle's condition on December 18. Kiesow depo., p. 56.

perceived impairment would limit the plaintiff's ability to work not in a particular job, but would exclude her from a general range of jobs. *See Partlow v. Runyon*, 826 F.Supp. 40, 45 (D.N.H. 1993). In light of the analysis undertaken above in section I(B), the plaintiff has failed to prove that she is "regarded as" substantially limited in the major life activity of working.

## II.    Legitimate, Nondiscriminatory Reason

Construing in her favor the plaintiff's assertion that elimination of waste is a major life activity in which she suffers substantial limitation, the court must now employ the *McDonnell Douglas*[14] burden-shifting test to determine whether the plaintiff was discriminated against because of her impairment. *McDonnell Douglas* sets out a three-step process in which the plaintiff must first make a prima facie showing of discrimination. If she succeeds, a burden to produce shifts to the defendant who must then provide a legitimate, nondiscriminatory reason for its alleged discriminatory conduct. Then the burden shifts back to the plaintiff to refute the defendant's evidence by showing that it constitutes a pretext for discrimination. *See Mesnick v. General Electric Co.*, 950 F.2d 816, 823 (1st Cir. 1991); *Soileau*, 928 F. Supp. at 52. To establish a prima facie case of discrimination, the plaintiff must show that (1) she has a disability under the MHRA; (2) she was qualified to perform the essential functions of the job; and (3) that the adverse employment decision was based on her disability. *Bailey v. Georgia-Pacific Corp.*, 176 F.Supp.2d 3, 6 (D.Me. 2001).

Even construing all facts in favor of the plaintiff, she has not presented a prima facie case of discrimination. The defendant adequately denies all the plaintiff's allegations of being limited, timed and observed during her restroom visits. Although

---

14 *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

it is clear from the testimony in this case that the atmosphere at work was at times tense and unpleasant, based in part on the conflict between the plaintiff and her immediate supervisor, this alone is insufficient to establish discrimination as a matter of law.

Even if the plaintiff had established a prima facie case of discrimination, the defendant asserts that it has articulated legitimate and non-discriminatory reasons for its decision to terminate the plaintiff's probation period, and therefore the plaintiff's claim must fail. *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 2109 (2001). The record indicates she was counseled on poor attitude, improper use of the unavailable mode on her telephone, and failure to follow instructions regarding message-taking and call referrals.

The burden would then shift back to the plaintiff to show that the defendant's reasons are merely pretextual and provide a screen for illegal discrimination. To this end, the plaintiff points to evidence that her performance improved after the December meetings and she adds allegations that other employees who committed similar errors did not suffer adverse employment actions. The allegations concerning her co-workers are unsupported in the record. The plaintiff has failed to dispute that she gave out inappropriate information, exhibited a poor attitude, and referred a call after being instructed not to do so. The defendant has adequately documented its nondiscriminatory reasons for terminating the plaintiff's probation and the plaintiff has not raised a genuine issue of material fact as to whether she was discriminated against. She was reasonably accommodated in both her work schedule and her access to the restroom. Accordingly, in light of the discussion above, the defendant is entitled to summary judgment on Count I of the plaintiff's complaint in which she alleges

discrimination in violation of the ADA and the MHRA.

III.    Whether the plaintiff has established a retaliation claim

The plaintiff claims that her demotion came about as a result of her contact with the Human Resources department on December 22, 1998 regarding a request for reasonable accommodation. As her demotion occurred three weeks later on January 11, 1999, she argues she suffered direct discrimination and retaliation.

To establish a case for retaliation, the plaintiff must show that (1) she engaged in a protected activity; (2) that an adverse employment action occurred; and (3) there is a causal link between the protected activity and the employment decision. *Soileau*, 928 F.Supp. at 52. The first two prongs are easily met here as it is undisputed the plaintiff engaged in protected activity by requesting accommodation and her return back to Clerk-Typist II was an adverse employment action. It is the third prong, the existence of a causal relationship, which the defendant disputes. All of the conduct which led to the plaintiff's demotion took place prior to her discussion with Human Resources. Other than the coincidence of the timing in this case, the defendant maintains there is no evidence to support the plaintiff's claim that her demotion was retaliatory.

The court must again rely on the *McDonnell Douglas* paradigm in its analysis of the causation element of retaliation. Several courts have held that the circumstance of timing may be sufficient to indicate a causal connection in retaliation cases. *See, e.g., Ruffino v. State Street Bank and Trust Co.*, 908 F.Supp. 1019, 1046 (D.Mass. 1995); *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 110 (1st Cir. 1988). Assuming in this case that the timing satisfies the first *McDonnell Douglas* prong, the court turns to the second step; whether the defendant has adduced a legitimate, nondiscriminatory reason for the plaintiff's demotion. This evidence is discussed in section II above. Additionally, the

16

defendant argues that the plaintiff cannot establish a hostile work environment because the complained of conduct was not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17,21 (1993). Further, the defendant asserts that the plaintiff cannot establish that the alleged extreme and offensive conduct occurred because of her disability.

To avoid summary judgment, the plaintiff must provide specific evidence to show that the defendant's reasons for her demotion were pretextual and that the actual reason was because she requested accommodation. While the plaintiff has made general allegations that she was subjected to hostile comments at the workplace, these allegation are not supported by competent evidence in the record. Conversely, the record indicates the plaintiff's supervisors were reviewing her poor job performance well before she sought an accommodation. Accordingly, she has failed to refute the defendant's justification for her demotion and the defendant is entitled to summary judgment on the retaliation claims contained in the plaintiff's complaint.

## III.    Conclusion

Therefore, for all the reasons above, the entry shall be:

Plaintiff's Motion to Amend is DENIED.
Defendant's Motion to Strike is DENIED.
Defendant's Motion for Summary Judgment is GRANTED; Judgment for the Defendant.

Dated:   July _10_, 2002

Donald H. Marden
Justice, Superior Court

17

F

Date Filed __11/9/00__ ___Kennebec___ Docket No. __CV00-239__
County

Action ___Other Civil___

# J. MARDEN

Cathy Doyle                              vs.   Department of Human Services

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Sumner H. Lipman, Esq.<br>Tracie L. Adamson, Esq.<br>227 Water Street<br>PO Box 1051<br>Augusta, Maine 04332-1051 | -Susan Herman AAG<br> State House Sta 6<br> Augusta Maine  04333 |

| Date of Entry | |
|---|---|
| 11/13/00 | Complaint, filed. s/Adamson, Esq.  (filed 11/9/00)<br>Case File Notice mailed to atty. |
| 11/21/00 | Original Summons with return service made upon Department of Human Services on 11/17/00, filed.<br>Original Summons with return service made upon State of Maine, Attorney General on 11/17/00, filed. |
| 12/6/00 | Answer of Defendant State of Maine, filed. s/Herman, AAG. |
| 12/7/00 | SCHEDULING ORDER, Marden, J.<br>"Scheduling Order filed.  Discovery deadline is August 7, 2001."<br>Copies mailed to attys of record. |
| 1/19/01 | Plaintiff's Motion for Enlargement of Time to File Request for Jury Trial, filed. s/Adamson, Esq.<br>Proposed Order, filed. |
| 1/22/01 | ORDER ON PLAINTIFF'S MOTION FOR ENLARGEMENT OF TIME TO FILE REQUEST FOR JURY TRIAL, Marden, J. (dated 1/19/01)<br>Copies mailed to attys of record. |
| 3/12/01 | Notification of Discovery Service, filed. s/Lipman, Esq.  (filed 3/8/01)<br>Plaintiff's Designation of Experts served on Susan Herman, AAG on 3/7/01 |
| 5/1/01 | Defendant State of Maine Department of Human Services' Motion for Enlargement of Time to Designate Experts, filed. s/Herman, AAG (filed 4/30/01<br>Notice, filed.<br>Proposed Order, filed. |
| 5/2/01 | Notification of Discovery Service of Defendant State of Maine, Department of Human Services' First Request for Production of Documents to Cathy Doyle and Interrogatories of State of Maine, Department of Human Services Propounded to Plaintiff Cathy Doyle served on Plaintiff on 4/27/01, filed.  s/S. Herman, AAG.<br>(filed 4/30/01) |